IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CAT HOLLIS, an individual, and JANE
DOE, an individual,

                Plaintiffs,

     v.

SKC INVESTMENT, INC.,

                Defendant.

No. 3:22-cv-00920-HZ

OPINION & ORDER

Corinna R. Spencer-Scheurich
Bonnie Allen-Sailer
Northwest Workers' Justice Project
310 SW 4th Ave, Ste 320

        Attorneys for Plaintiffs

Anthony D. Kuchulis
Colleen O. Muñoz
Littler Mendelson, PC
1300 SW Fifth Ave, Ste 2050

        Attorneys for Defendant

HERNÁNDEZ, District Judge:

Plaintiffs sued Defendant for employment discrimination and failure to pay wages, and Defendant counterclaimed for unjust enrichment and intentional interference with economic relations. Defendant moves for summary judgment on Plaintiffs' claims, arguing that Plaintiffs were properly classified as independent contractors and that Plaintiffs fail to make a prima facie case of discrimination. Def. Mot. Summ. J., ECF 32. Plaintiffs cross-move for summary judgment on their wage claims, arguing that they should have been classified as employees. Pl. Mot. Part. Summ. J., ECF 34. Plaintiffs also move for summary judgment on Defendant's counterclaims. *Id.* For the following reasons, the Court grants Plaintiffs' Motion in part and grants Defendant's Motion in part.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Additional facts are addressed in discussing the parties' Motions. Plaintiffs Cat Hollis[1] and Jane Doe[2] worked as exotic dancers for Defendant SKC Investment, which does business as Club 205. Spencer-Scheurich Mot. Decl. Ex. 2, Doe Dep. 4:20-22, 38:11; Ex. 4, Hollis Dep. 17:8-18, ECF 35. Club 205 is an entertainment venue with a bar, lottery machines, and three stages featuring exotic dancers. Muñoz Mot. Decl. Ex. E, Fleischmann Dep. 19:22-24, ECF 33; Spencer-Scheurich Mot. Decl. Ex. 3, Fleischmann Dep. 130:3-9; Spencer-Scheurich Resp. Decl. Ex. 6, Lewis Dep. 62:3-63:2, ECF 39. Plaintiff Doe danced at the club from December 2017 until March 2020, and Plaintiff Hollis danced at the club from May 2019 to March 2020. Spencer-Scheurich Mot. Decl. Ex. 2, Doe Dep. 62:18-63:2; Ex. 4, Hollis Dep. 17:19-21. Plaintiff Doe danced under the stage name

---

[1] Plaintiff Cat Hollis uses they/them pronouns.

[2] The Court previously granted Plaintiff Jane Doe's motion to proceed anonymously. ECF 12.

Aspen. *Id.* Ex. 2, Doe Dep. 4:20-22. Plaintiff Hollis danced under the stage name Roxi. Spencer-Scheurich Resp. Decl. Ex. 6, Lewis Dep. 198:13-14.

When Plaintiffs first started dancing at the club, their shifts were booked by Steve White, who owned a business called Big Dog Entertainment. Spencer-Scheurich Mot. Decl. Ex. 2, Doe Dep. 36:6-25; Ex. 4, Hollis Dep. 30:4-25. After White died in or about December 2019, Dale Lewis, the club's then-general manager, took over scheduling from White. *Id.* Ex. 6, Lewis Dep. 42:25-43:13. Plaintiffs texted White or Lewis each week they wanted to work to request shifts, and White or Lewis scheduled them for shifts based on availability and the club's set shift schedule. *Id.* at 64:8-65:17, 66:11-19; Muñoz Mot. Decl. Ex. B, Hollis Dep. 299:17-25; Ex. D, Doe Dep. 37:9-18.

Defendant classified Plaintiffs as independent contractors rather than employees and did not include Plaintiffs on the payroll or pay Plaintiffs any wages. Spencer-Scheurich Mot. Decl. Ex. 6, Lewis Dep. 122:13-20. Plaintiffs earned income through tips from customers and fees they charged customers for private dances. Def. Mot. 6; Pl. Resp. 11-12, ECF 36. They were required to charge a minimum of $20 for private dances, but there was no maximum fee. Spencer-Scheurich Mot. Decl. Ex. 7, Murchie Dep. 73:22-74:2. Plaintiffs paid Defendant a stage fee of $25 per night and $5 per song they danced to. *Id.* Ex. 2, Doe Dep. 33:22-24; Ex. 6, Lewis Dep. 115:12-19. Defendant's cook, doorman, DJs, bartenders, wait staff, general manager, and bookkeeper were all classified as employees and received a paycheck. Spencer-Scheurich Mot. Decl. Ex. 6, Lewis Dep. 28:6-29:5.

In March 2020, Defendant temporarily closed Club 205 because of the COVID-19 pandemic. Muñoz Mot. Decl. Ex. D, Doe Dep. 127:9-17. In response to the murder of George Floyd in May 2020, Plaintiffs and other exotic dancers in Portland participated in what was

known as the PDX Stripper Strike. *Id.* at 128:6-9; Muñoz Mot. Decl. Ex. B, Hollis Dep. Ex 6.

Participants posted on social media and demanded that clubs featuring exotic dancers participate

in cultural sensitivity training and listening sessions. *Id.* On June 8, 2020, Plaintiff Hollis

contacted Lewis to ask if he had heard about the Stripper Strike. Spencer-Scheurich Resp. Decl.

Ex. 6, Lewis Dep. Ex. 8 at 2. Over approximately the next two weeks, Plaintiff Hollis

communicated with Lewis and Kelli Fleischmann, the club's bookkeeper, about the Stripper

Strike. *Id.*; Spencer-Scheurich Resp. Decl. Ex. 3, Fleischmann Dep. Ex. 21. On June 10, 2020,

Lewis contacted Plaintiff Doe to schedule her for shifts at Club 205. Spencer-Scheurich Resp.

Decl. Ex. 6, Lewis Dep. Ex. 4 at 5. Plaintiff Doe responded that she was participating in the

Stripper Strike and wanted to return once the club implemented racial sensitivity training. *Id.*

Lewis did not respond. On June 20, 2020, Plaintiff Hollis contacted Lewis to request shifts. *Id.*

Ex. 6, Lewis Dep. Ex. 8 at 5. Lewis did not respond. On June 24, 2020, Fleischmann emailed the

Portland Stripper Strike Collective on behalf of Defendant to decline to align with the Stripper

Strike. Spencer-Scheurich Resp. Decl. Ex. 3, Fleischmann Dep. Ex. 23. Plaintiffs did not dance

at Club 205 after March 2020.

On December 30, 2021, Plaintiffs sued Defendant in state court, alleging a hostile work

environment based on sexual harassment and race discrimination. Spencer-Scheurich Resp. Stay

Decl. Ex. 1, ECF 21. On June 27, 2022, Plaintiffs filed their Complaint with this Court, alleging

federal and state-law retaliation claims and federal and state-law wage claims. ECF 1. On July

12, 2022, Defendant moved to consolidate the cases. ECF 6. The Court denied the motion. ECF

10. Defendant answered the Complaint, bringing counterclaims for unjust enrichment and

intentional interference with economic relations. ECF 13. Defendant then moved to stay this case

pending the outcome of the state court proceeding. ECF 16. The Court denied that motion. ECF

23. Discovery proceeded, and Defendant filed its Motion for Summary Judgment on September 15, 2023. ECF 32. Plaintiffs filed their Motion for Partial Summary Judgment on September 18, 2023. ECF 34. The Court held oral argument on November 27, 2023.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Earl v. Nielsen Media Rsch., Inc., 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more

persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotations omitted). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

## DISCUSSION

The Court first addresses the parties' cross-motions for summary judgment on Plaintiffs' federal and state-law wage claims and concludes that Plaintiffs are properly classified as employees under federal and state wage and hour law. The Court then addresses Defendant's Motion on Plaintiffs' discrimination claims and concludes that Defendant is entitled to summary judgment on those claims. Finally, the Court addresses Plaintiffs' Motion on Defendant's counterclaims and concludes that Plaintiffs are entitled to summary judgment on those claims.

## I.    Cross-Motions on Plaintiffs' FLSA and Oregon Wage Claims

Both parties move for summary judgment on whether Plaintiffs were employees under federal and state wage and hour statutes. Defendant also argues that Plaintiffs cannot pursue their claim under the Fair Labor Standards Act ("FLSA") because the statute of limitations bars the claim and Plaintiffs lack standing. The Court concludes that Plaintiffs may pursue their FLSA claims and that Plaintiffs are employees for their federal and state wage claims.

### A.    FLSA Claims

For their FLSA claims, Plaintiffs allege that Defendant (1) failed to pay them the federal minimum wage rate for all hours worked in violation of 29 U.S.C. § 206, and (2) required

payment of fees that constituted illegal kickbacks in violation of 29 C.F.R. § 531.35. Compl. ¶¶ 60-63. Defendant brings three attacks against the claim, arguing that (1) the statute of limitations bars the claims, (2) Plaintiffs lack standing to pursue the claims, and (3) the claims fail because Plaintiffs were independent contractors, not employees. Def. Mot. 9-17, 20-23. Plaintiffs cross-move on the third issue, arguing that they were employees. Pl. Mot. 11-37.

> i.    Statute of Limitations

Under the FLSA, a cause of action "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued[.]" 29 U.S.C. § 255(a). It is undisputed that Plaintiffs last performed for Defendant in March 2020 but filed their case in June 2022, more than two years later. Def. Mot. 9 (citing Compl. ¶¶ 8-9). Plaintiffs' FLSA claims are time-barred unless Defendant's violation was willful.

"A violation is willful if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) (internal quotations omitted). An employer need not knowingly violate the statute, but mere negligence is insufficient. *Id.* "The three-year statute of limitations may be applied where an employer disregarded the very possibility that it was violating the statute[.]" *Id.* (internal quotations omitted). "An employer's violation of the FLSA is 'willful' when it is on notice of its FLSA requirements, yet [takes] no affirmative action to assure compliance with them." *Id.* (internal quotations omitted) (finding willful violation where "the City failed to investigate whether its exclusion of cash-in-lieu of benefits payments from the regular rate of pay complied with the FLSA at any time following its initial determination that the payments constituted a benefit"). The lack of binding caselaw directly on point will not necessarily protect

an employer from a finding of willfulness. *Id.* at 906-07. But evidence of consulting legal experts can show a good faith attempt to comply with the law. *Serv. Emps. Int'l Union, Loc. 102 v. Cnty. of San Diego*, 60 F.3d 1346, 1355-56 (9th Cir. 1994).

Defendant asserts that Plaintiffs have no evidence of willfulness. Def. Mot. 10. Defendant cites evidence that it "took reasonable steps necessary to comply with the laws, conducted research, and consulted legal counsel and other local club owners." *Id.* (citing Muñoz Mot. Decl. Ex. E, Fleischmann Dep. 72:25-73:1, 76:1-3, 77:1-3). Plaintiffs counter that "the evidence shows that Defendant *knew* about classifying workers as independent contractors versus employees, but showed reckless disregard of this important distinction by enacting policies and allowing practices that created an employment relationship with Plaintiffs." Pl. Resp. 14. Plaintiffs point to Defendant's booking practices and a staff memo instructing employees to report information about dancers' conduct to the booking agent and the general manager. *Id.* at 15-16. Defendant replies that because it did research to determine the difference and offered dancers the opportunity to decide whether to be employees or independent contractors, Plaintiffs fail to show willfulness. Def. Reply 3-5, ECF 42.

Fleischmann, Defendant's corporate representative, testified that Defendant's lawyer prepared a contract for dancers and that to her recollection, the contract allowed Plaintiffs to choose whether to be independent contractors or employees. Muñoz Mot. Decl. Ex. E, Fleischmann Dep. 72:13-16. Fleischmann also testified that Defendant had spoken with counsel about how to treat a dancer as an employee. *Id.* at 72:21-73:1. Fleischmann testified that Defendant "collected a bunch of contracts [from other clubs] to see kind of what was out there and to look through them." *Id.* at 76:1-3; 77:1-3. The contract for the dancers explained the difference between being an employee and being an independent contractor. *Id.* at 72:17-20.

Fleischmann testified, "I have yet to meet a dancer that wants to be controlled as an employee."
Muñoz Reply Decl. Ex. A, Fleischmann Dep. 70:9-10, ECF 43. She stated that dancers were
independent contractors because they had control over their schedule and were responsible for
their own income. *Id.* at 71:10-17. Plaintiffs counter that dancers did not sign contracts with Club
205 until after Plaintiffs had stopped working at the club. Pl. Reply 11, ECF 44. Lewis testified
that "[n]o contracts were signed between dancers and 205" at the time Plaintiff Hollis emailed to
ask for a copy of a contract in July 2020. Spencer-Scheurich Reply Decl. Ex. 6, Lewis Dep.
221:11-12, ECF 45. He stated, "That didn't start till September of 2020." *Id.* at 221:12-13.

Lewis testified that he wanted to be sure that staff did not correct dancers "[f]or the
reason them being an independent contractor. I didn't want to violate any rules that may pertain
to controlling them, and . . . we didn't want to control them." Muñoz Reply Decl. Ex. B, Lewis
Dep. 142:15-21. Lewis testified that dancers "had a chance to become employees, if they wanted
to." *Id.* at 234:23-24. He stated that if they became employees, Defendant would have control
over their work hours and their fees. *Id.* at 235:7-11. The testimony of Lewis and Fleischmann
suggests an intent to follow the law. But actions Defendant took after Plaintiffs stopped working
for Defendant do not show an absence of willfulness during the relevant period.

Plaintiffs point to evidence that Defendant was aware of the law but chose not to follow
it. When Plaintiffs first started working for Defendant, Steve White would contact dancers to
schedule their dance time. Spencer-Scheurich Mot. Decl. Ex. 2, Doe Dep. 36:6-13; Ex. 4, Hollis
Dep. 30:4-12. Although White operated a separate company called Big Dog Entertainment,
Plaintiffs both testified that they thought White worked in management for Defendant. *Id.* Ex. 2,
Doe Dep. 36:15-25; Ex. 4, Hollis Dep. 30:11-12. There is evidence supporting that belief as
reasonable. For instance, Lewis testified that he and White came up with a "Two for Tuesdays"

promotion together. *Id.* Ex. 6, Lewis Dep. 73:16-74:6, 74:25-75:2. After White died, Lewis took over booking dancers, and Defendant received the income from stage rental fees that had previously gone to Big Dog. *Id.* Ex. 3, Fleischmann Dep. 51:10-15. This evidence of close cooperation between Plaintiffs' booking agent and Defendant, and the continuity of operations after the booking agent died, supports Plaintiffs' argument that Defendant created only the appearance of an independent contractor relationship.

Plaintiffs also point to a memo Defendant sent its employees titled "Working With Dancers." Pl. Resp. 15 (citing Fleischmann Dep. Ex. 11). The memo, dated November 1, 2018, was sent from Defendant's owners to its managers, security personnel, DJs, bartenders, servers, and kitchen staff. Spencer-Scheurich Resp. Decl. Ex. 3, Fleischmann Dep. Ex. 11. The memo begins, "As you all know, we have taken careful steps to document that the independent contractor dancers who perform at Club 205 are engaged by an independent business and are free from the club's direction and control as to how they perform the details of their work and how they present their performances." *Id.* The memo instructs staff not to train dancers or require them to attend staff meetings. *Id.* it states, "Dancers are free to determine their own performance shifts and schedules, and have entered into a contract with the independent booking agent." *Id.* It states that dancers were free to leave the club when not performing, but asks staff to notify the booking agent and management if a dancer was not present as scheduled or left unexpectedly. *Id.* It advises that dancers cannot be disciplined for canceling a shift. *Id.* It states that dancers can select their music from the playlist, the number of songs per rotation, what to wear, when and how to disrobe, and whether to perform with another dancer. *Id.* It also notes that two songs per rotation is the industry standard and asks staff to report it if a dancer is not honoring her contract terms. *Id.* The memo states that while dancers are free to promote their businesses when not

performing at the club, staff should report any solicitations of customers to other businesses while the dancers are at the club. *Id.* The memo also advises staff that they should not try to coerce dancers to give them tips or punish them for not doing so. *Id.* Plaintiffs argue that the memo, while creating the appearance of reaffirming dancers' independence, in fact shows attempts to exert control over them by asking staff to report on their behavior. Pl. Resp. 16.

The Court concludes that there is a genuine dispute of material fact as to whether Defendant willfully violated the FLSA. Based on the evidence, a jury could reasonably conclude that Defendant was aware of the distinction between employees and independent contractors but sought to exert control over Plaintiffs as though they were employees. Evidence of this control is discussed further below. In arguing that there is no evidence of willfulness, Defendant relies on *Hollis v. R&R Restaurants, Inc., et al*, No. 3:21-cv-00965-YY (D. Or. Nov. 2, 2023). Def. Notice of Supp. Authority Ex. 1, ECF 52. In that case, another court in this district held that there were no facts showing willfulness, in part because very little discovery happened. *Id.* at 13. Here, however, the record contains ample evidence from which a jury could find willfulness. Defendant is not entitled to summary judgment based on the statute of limitations.

ii.    Standing

Defendant challenges Plaintiffs' standing to bring their FLSA wage claims. Article III of the Constitution limits the subject matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must show three elements to establish standing. First is "an injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation

marks and citations omitted). Second, that injury must be "fairly traceable to the challenged action of the defendant," and not "the result of the independent action of some third party not before the court." *Id.* (quotation marks and alternations omitted). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* (citations omitted).

Defendant argues that Plaintiffs lack standing to bring their FLSA wage claims because they failed to pay their taxes, so any back wages received would go to the taxing authority, not Plaintiffs. Def. Mot. 20-23. Defendant's argument lacks merit. It is undisputed that Defendant did not pay Plaintiffs any wages during the time they worked for Defendant and that Plaintiffs' income was in the form of tips and private dance fees paid by customers. If Plaintiffs were employees, they were entitled to receive wages from Defendant for the hours worked. The nonpayment of wages is a concrete and particularized harm, was caused by Defendant's misclassification of Plaintiffs, and is redressable by a payment of back wages. Plaintiffs have constitutional standing.

Defendant's suggestion that Plaintiffs lack prudential standing because their claim to relief rests on the rights or interests of third parties, Def. Mot. 23, is equally lacking in merit. Defendant asserts that any wages owing would be the property of the taxing authority, and therefore a decision in Plaintiffs' favor would not redress their injury. *Id.* Plaintiffs concede that they still owe taxes on some of the income derived from working for Defendant. Pl. Resp. 41. They correctly point out that the right to a minimum wage, the right they assert here, is a right held by Plaintiffs, not the taxing authorities. *Id.* at 42. And they correctly state that if they recover back wages from Defendant and use the money to pay the taxes they owe, that would

benefit Plaintiffs because their tax obligations would be satisfied. *Id.* The Court also agrees with

Plaintiffs that their tax liability at this point is speculative. *See id.*

Defendant next argues that because Plaintiffs failed to maintain records of their tips and

private dance fees, they cannot recover wages. Def. Reply 14-15. Defendant relies on *Matson v.*

*7455, Inc.*, in which the district court found that the plaintiff, an exotic dancer, could not proceed

on her FLSA claim because she kept no records distinguishing how much she earned in tips from

how much she earned in fixed fees. No. CV 98-788-HA, 2000 WL 1132110, at *6 (D. Or. Jan.

14, 2000). The Court declines to follow this approach. First, under the FLSA, the employer has

an obligation to keep records of employees' wages and hours. 29 U.S.C. § 211(c); *Anderson v.*

*Mt. Clemens Pottery Co*, 328 U.S. 680, 687 (1946). Defendant did not track how much dancers

earned on stage. Spencer-Scheurich Resp. Decl. Ex. 3, Fleischmann Dep. 54:2-7; Ex. 6, Lewis

Dep. 93:22-24. It would be contrary to the language and purpose of the FLSA to bar Plaintiffs'

claims because they did not keep complete records. In *Anderson*, the Supreme Court held that a

putative employee's FLSA claim can proceed if the plaintiff "produces sufficient evidence to

show the amount and extent of that work as a matter of just and reasonable inference." 328 U.S.

at 687. "The burden then shifts to the employer to come forward with evidence of the precise

amount of work performed or with evidence to negative the reasonableness of the inference to be

drawn from the employee's evidence." *Id.* at 687-88.

Second, *Matson* rested on the possibility of offsetting part of the minimum wage through

tip income. 2000 WL 1132110, at *6. As Plaintiffs point out, although federal law allows

employers to offset part of the minimum wage with tips, this offsetting reduces the minimum

wage but does not eliminate the requirement to pay it. Pl. Resp. 25 (citing 29 C.F.R. § 531.50).

Plaintiffs also dispute whether Defendant can use the tip income to offset its wage payment

obligations. *Id.* The Court need not decide that here because it is undisputed that Defendant did not pay Plaintiffs any wages. In sum, Plaintiffs' lack of precise records is not a bar to recovery.

Finally, Defendant points to a settlement Plaintiff Hollis accepted in November 2021, asserting that Plaintiff Hollis waived their ability to recover unpaid wages. Def. Reply 15-16 (citing Muñoz Reply Decl. Ex. J). On April 22, 2021, Plaintiff Hollis filed an administrative action against Defendant with the National Labor Relations Board ("NLRB"), alleging violations of the National Labor Relations Act ("NLRA"). Pl. Sur-Resp. Ex. A, ECF 51. In the administrative complaint, Plaintiff Hollis alleged that Defendant terminated them because of their participation in the Stripper Strike. *Id.* ¶ 4. They sought damages based on that conduct. *Id.* ¶ 6. *See also* Spencer-Scheurich Resp. Decl. Ex. 11 (affidavit of Plaintiff Hollis filed with NLRB in support of administrative complaint). Plaintiff Hollis settled with Defendant and received backpay, interest, and frontpay. Muñoz Reply Decl. Ex. J at 1. In arguing for waiver, Defendant relies on *Dent v. Cox Communications Las Vegas, Inc.*, in which the plaintiff entered into a Department of Labor-supervised settlement of his FLSA overtime compensation claims against his former employer and then sued the employer for unpaid overtime wages under the FLSA. 502 F.3d 1141, 1142 (9th Cir. 2007). The Ninth Circuit held that the settlement waived the plaintiff's claims for the period specified in the settlement, but not for other time periods. *Id.* at 1147.

Plaintiff Hollis argues that the NLRB settlement does not apply here because it settled only their claims under the NLRA. Pl. Sur-Resp. 2-3. The settlement agreement states that it "settles only the allegations in the above-captioned case(s), and does not settle any other case(s) or matters." Muñoz Reply Decl. Ex. J at 1. Plaintiff Hollis also argues that "[t]he back pay remedy under the NLRA seeks to compensate an employee for lost wages that start at the date of

unlawful termination." Pl. Sur-Resp. 3 (citing *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 142 (2002)). Plaintiff Hollis's first argument resolves the issue. By its terms, the NLRB settlement applies only to Plaintiff Hollis's NLRA claims, which are different from their FLSA claims. Thus, the settlement does not preclude Plaintiff Hollis from pursuing their FLSA wage claims. The Court now turns to whether Plaintiffs were employees or independent contractors under the FLSA.

           iii.     Employment Relationship

The parties dispute whether Plaintiffs were employees of Defendant or independent contractors. Because each side incorporates the arguments in its Motion in responding to the other side's Motion, the Court addresses the cross-motions on this issue together. Where applicable, the Court notes factual disputes that may be viewed in the light most favorable to one party or the other.

Under the FLSA, "'[e]mploy' includes to suffer or permit to work." 29 U.S.C. § 203(g). This definition is "broad," but "it is not so broad as to include those who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728-29 (1947) (internal quotations omitted). In determining whether workers are employees or independent contractors, courts look to the economic reality of the working relationship and not the labels used: "[w]here the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act." *Id.* at 729.

The Ninth Circuit has not settled on a definitive formulation of the economic realities test. The parties rely on different formulations in their cross-motions. Defendant relies on *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979), which sets out a six-

factor test. Def. Mot. 11. The *Real* court drew the six factors from Supreme Court caselaw and

noted that they were not exhaustive. 603 F.2d at 754 n.14. Those factors are:

> 1) the degree of the alleged employer's right to control the manner in which the
> work is to be performed;
> 2) the alleged employee's opportunity for profit or loss depending upon his[, her,
> or their] managerial skill;
> 3) the alleged employee's investment in equipment or materials required for his[,
> her, or their] task, or his[, her, or their] employment of helpers;
> 4) whether the service rendered requires a special skill;
> 5) the degree of permanence of the working relationship; and
> 6) whether the service rendered is an integral part of the alleged employer's
> business.

> *Id.* at 754. This Court and others in the Ninth Circuit have used the *Real* six-factor test.

*E.g.*, *Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp. 3d 1234, 1242 (D. Or. 2014); *Chao v.
Westside Drywall, Inc.*, 709 F. Supp. 2d 1037, 1063 (D. Or. 2010), *as amended* (May 13, 2010);
*Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 478 (N.D. Cal. 2017).

Plaintiffs rely on *Torres-Lopez v. May*, 111 F.3d 633 (9th Cir. 1997), which considered

thirteen factors. Pl. Mot. 13-14. The *Torres-Lopez* court relied on five regulatory factors under

the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA")[3] and eight additional

factors from FLSA caselaw. 111 F.3d at 639-40. The six factors of *Real* are included in the

thirteen factors of *Torres-Lopez. Compare* 603 F.2d at 754 *with* 111 F.3d at 639-40. Five of the

thirteen factors in *Torres-Lopez* were regulatory factors from the AWPA. 111 F.3d at 639-40.

Those factors are:

> (A) The nature and degree of control of the workers;
> (B) The degree of supervision, direct or indirect, of the work;
> (C) The power to determine the pay rates or the methods of payment of the workers;
> (D) The right, directly or indirectly, to hire, fire, or modify the employment
> conditions of the workers; [and]

---

[3] Plaintiffs acknowledge this but assert that they may rely on caselaw addressing both statutes
because both use the same definition of "employ." Pl. Mot. 14 n.3. The AWPA has adopted the
definition of "employ" used in the FLSA. 29 U.S.C. § 1802(5).

(E) Preparation of payroll and the payment of wages.

*Id.* (citing 29 C.F.R. § 500.20(h)(4)(ii)). The regulations have changed since *Torres-Lopez* was

decided in 1997. They now list the six *Real* factors and state that the definition of "employ" in

the AWPA should be interpreted in accordance with those factors. 29 C.F.R. § 500.20(h)(4). The

five regulatory factors in *Torres-Lopez* point to relevant considerations in evaluating the

economic realities of a working relationship, so the Court will still consider them.

The other eight factors in *Torres-Lopez* derive from *Real* and *Rutherford*. Those eight

factors are:

> (1) whether the work was a specialty job on the production line,
> (2) whether responsibility under the contracts between a labor contractor and an
> employer pass from one labor contractor to another without material changes,
> (3) whether the premises and equipment of the employer are used for the work,
> (4) whether the employees had a business organization that could or did shift as a
> unit from one [worksite] to another,
> (5) whether the work was piecework and not work that required initiative, judgment
> or foresight,
> (6) whether the employee had an opportunity for profit or loss depending upon [the
> alleged employee's] managerial skill,
> (7) whether there was permanence [in] the working relationship, and
> (8) whether the service rendered is an integral part of the alleged employer's
> business.

*Torres-Lopez*, 111 F.3d at 640 (internal quotations and citations omitted). Because *Real*

and *Rutherford* are both good law, the Court may consider these eight factors. The Court first

addresses the six *Real* factors, then turns to the other seven factors from *Torres-Lopez* to the

extent that they differ from the *Real* factors.

a.    Right to Control the Manner of Work

The first *Real* factor corresponds to the first two regulatory factors of *Torres-Lopez*,

which address the nature and degree of control and degree of supervision. Defendant argues that

it had no control over Plaintiffs' manner of performance, their appearance while performing, or

their schedules. Def. Mot. 12. Defendant also asserts that Plaintiffs were free to drink alcohol during shifts and hold other jobs. *Id.* Plaintiffs counter that Defendant exerted a high degree of control over their work. Pl. Resp. 19-21; Pl. Mot. 17-26. Plaintiffs identify the following areas of control: auditioning, scheduling, stage and private dance fees, performances, and operation of the club. Pl. Mot. 18-24. The Court considers all of the areas the parties have identified and concludes that this factor favors a finding that Plaintiffs were employees.

The Court first addresses Plaintiffs' argument that White was either a joint employer of Plaintiffs along with Defendant or a misclassified employee of Defendant. Pl. Mot. 16-17. Plaintiffs point to evidence that White exclusively booked dancers for Defendant during the years Plaintiffs danced at Club 205. Frank Murchie, one of Defendant's DJs, testified that to his knowledge, White was only booking dancers for Club 205 from 2018 until his death. Spencer-Scheurich Mot. Decl. Ex. 7, Murchie Dep. 146:2-14. Lewis testified that he and White collaborated on how to advertise the club in Exotic Magazine, and White managed the club's social media accounts. *Id.* Ex. 6, Lewis Dep. 41:2-20, 75:21-77:10. Plaintiffs point to testimony from some of Defendant's security staff, DJs, and bartenders that they reported to White about dancers' performance and behavior. *Id.* Ex. 1, Davis Dep. 59:12-24; Ex. 7, Murchie Dep. 147:8-148:10; Ex. 9, Register Dep. 33:1-18; Ex. 10, Saye Dep. 29:10-32:13. Plaintiffs also argue that nothing material changed in how dancers were scheduled or how they performed their work once Lewis took over scheduling after White died. Pl. Mot. 17. Lewis testified that when he took over, he used the schedule and contact information White had created. Spencer-Scheurich Mot. Decl. Ex. 6, Lewis Dep. 57:7-24. Defendant disputes none of this testimony. As discussed above, Lewis used the same scheduling system as White. Unless evidence in the record indicates a difference in practice between White and Lewis that materially affects the analysis, the Court

will not distinguish periods of alleged employment based on whether White or Lewis was in charge of scheduling dancers. Plaintiffs have shown that White's separate business entity is not on its own a basis to distinguish the facts, and Defendant does not dispute this. The Court now turns to evidence of the degree of supervision and control Defendant exerted over Plaintiffs.

Dancers were hired through auditions, both when White was responsible for hiring dancers and when Lewis took over after White died. Spencer-Scheurich Mot. Decl. Ex. 6, Lewis Dep. 87:17-22; Ex. 10, Saye Dep. 24:11-25:2. Defendant does not dispute this. The use of an audition as the method of hiring does not favor either party. The continuity of the hiring process between White and Lewis slightly favors a finding that Plaintiffs were employees.

Defendant exercised control over the club's hours of operation and Plaintiffs' schedules. The club owners set the hours of operation as 10:30 am to 2:30 am. *Id.* Ex. 6, Lewis Dep. 25:12-17. White, and later Lewis, set schedules for dancers. *Id.* at 42:25-43:13. The schedules were based on shifts that the club set. *Id.* at 60:15-61:16. Dancers texted with their requested schedule each week and Lewis would schedule them for shifts based on the regular shifts the club set. *Id.* at 64:8-65:17, 66:11-19; Muñoz Mot. Decl. Ex. B, Hollis Dep. 299:17-25; Ex. D, Doe Dep. 37:9-18. Lewis testified that scheduling was usually first come, first served because he did not always know when dancers would take a vacation, but he might reserve shifts for some dancers who scheduled regularly. Spencer-Scheurich Mot. Decl. Ex. 6, Lewis Dep. 107:9-15. Plaintiff Doe testified that she had flexibility to determine which days or nights she wanted to work, "but once I was booked for any shifts, I had to show up for them." Muñoz Mot. Decl. Ex. D, Doe Dep. 37:22-24. Doe also stated that if she was traveling, she could say she was unavailable, she would not be scheduled, and she could come back to work after her trip without any penalty. *Id.* at 37:25-38:8.

White required Plaintiffs to request weekday shifts in order to be scheduled to work weekends. Spencer-Scheurich Mot. Decl. Ex. 7, Murchie Dep. 147:8-21; Ex. 2, Doe Dep. 139:17-21; Ex. 4, Hollis Dep. 29:2-11. Plaintiff Hollis testified, "What I remember being told is that I had to work three weekday shifts in order to get one weekend shift." *Id.* Ex. 4, Hollis Dep. 29:7-9. Lewis testified that when he took over scheduling, he did not continue with that requirement. *Id.* Ex. 6, Lewis Dep. 66:4-6. But Plaintiff Hollis testified that although he never said so, they believed Lewis had the same policy. *Id.* Ex. 4, Hollis Dep. 123:24-124:19. While there is a genuine dispute on this issue, it does not change the outcome on this factor.

Plaintiffs point to evidence that they could not leave the club without permission during shifts. Plaintiffs testified that they understood, and employees of Defendant testified that they understood, that Plaintiffs were not allowed to leave the club without extenuating circumstances and that they needed to request permission from White or Lewis to miss a shift or leave early. Spencer-Scheurich Mot. Decl. Ex. 1, Davis Dep. 70:16-71:18; Ex. 8, Pleasants Dep. 47:13-48:2, Ex. 2, Doe Dep. 109:8-11, 110:5-9, 111:23-112:16; Ex. 4, Hollis Dep. 300:6-11, 300:22-301:19. DJs reported to White and Lewis when dancers showed up and if a dancer left early, as well as behavioral problems with dancers. *Id.* Ex. 6, Lewis Dep. 129:12-130:1; Ex. 7, Murchie Dep. 147:22-148:22; Ex. 8, Pleasants Dep. 35:1-36:8. Harold Davis, a security guard for Defendant, testified that in his understanding, dancers "were supposed to stay there for the duration of their shift for security purposes and a lot of other, you know, just like the reality of the gig." *Id.* Ex. 1, Davis Dep. 70:18-21. Davis testified that dancers were expected not to leave "short of extenuating circumstances . . . which she would clear with Steve White or Dale Lewis." *Id.* at 71:11-15. He stated, "Standard operating procedure was you come do your shift, and if you had to go home early, you probably wouldn't be back that night, so to speak." *Id.* at 71:15-18.

Plaintiffs both testified that they were told to ask permission to leave early. Plaintiff Doe testified that she asked White for the night off after she was sexually assaulted and asked to leave early when she had a medical emergency. *Id.* Ex. 2, Doe Dep. 109:8-11, 110:5-9, 111:23-112:5. Doe testified, that "in general, the club rule was that you did need to ask" to leave early. *Id.* at 112:9-11. She stated, "you would ask the deejay about it, and they would say to text the manager, and then you would text the manager." *Id.* at 112:10-12. She stated that this procedure was not in writing but was how she understood things to work. *Id.* at 112:15-19. Plaintiff Hollis testified that if they did not show up for a scheduled shift, "I would get an angry phone call from Dale" Lewis. *Id.* Ex. 4, Hollis Dep. 300:6-8. They testified that in addition, "I probably wouldn't be able to work weekends." *Id.* at 300:10-11. Plaintiff Hollis stated that if they wanted to leave work early one night, "I would be told to wait until later." *Id.* at 300:25. They stated that they "always asked permission" to leave early because they assumed it was required. *Id.* at 301:2-6. They stated that one time they wanted to go across the street to an ATM and were told that they could not come back if they left the club. *Id.* at 301:14-19. Defendant points to testimony from Davis, a security guard, that dancers did not ask him for permission to leave the club and that Davis would just walk them to their cars when they left. Muñoz Reply Decl. Ex. F, Davis Dep. 70:9-15. This testimony does not create a genuine dispute of fact. Plaintiffs testified that they needed permission from the manager to leave early, and Davis testified to the same. Davis is a security guard, not a manager. And Defendant does not dispute Plaintiffs' evidence that club employees monitored their presence during shifts. The undisputed evidence shows that Plaintiffs were subject to a high degree of supervision and control in terms of their presence at the club.

Plaintiffs point to stage and private dance fees as evidence of control. Pl. Mot. 20. Plaintiffs had to pay Defendant a stage fee of $25 per night. Spencer-Scheurich Mot. Decl. Ex. 2,

Doe Dep. 33:22-24. Plaintiffs were required to charge at least $20 per song for a private dance, and pay $5 of what they charged to Defendant. *Id.* Ex. 7, Murchie Dep. 73:22-74:2; Ex. 6, Lewis Dep. 115:1-25. Defendant does not dispute this testimony. The fee structure and required fees show a degree of control over Plaintiffs, though the lack of a set maximum private dance fee shows that Plaintiffs had some control over what they charged.

Defendant argues that Plaintiffs had control over whether to solicit private dances. Def. Mot. 12. Plaintiff Hollis testified that as far as they knew, they had complete discretion to choose who to have private dances with, but they never had to exercise that discretion. Muñoz Mot. Decl. Ex. B, Hollis Dep. 141:17-21. Plaintiff Doe testified that she had the option to solicit private dances between sets but was not required to do so. *Id.* Ex. D, Doe Dep. 28:19-22, 31:14-17. This testimony shows a greater degree of freedom for Plaintiffs. But as Plaintiffs point out, their income was derived only from tips and private dance fees, and they were limited in how often they could dance on stage. Pl. Reply 20. The performance and pay system Defendant set up created an environment in which refusing private dances made little economic sense during any given shift. *Id.* Plaintiffs had freedom to choose whether to solicit private dances, but that freedom was constrained by the context of the work and pay structure Defendant created.

Plaintiffs submit evidence that Defendant exercised control over the logistics of their performances. Two of the club's DJs testified that dancers checked in with the DJs, who placed them on a rotation the DJs controlled. Spencer-Scheurich Mot. Decl. Ex. 8, Pleasants Dep. 53:18-54:4; Ex. 10, Saye Dep. 26:2-14. The three stages at the club were opened at times set by the club. *Id.* Ex. 6, Lewis Dep. 62:3-63:2. Dancers were put on the rotation based on which stages were open. *Id.* at 95:2-10. They were rotated to different stages throughout their shift based on which stages were open. *Id.* at 95:23-96:4. Warren Pleasants, one of the club's DJs,

testified that dancers normally had two-song sets, but sometimes he would accommodate them with a three-song set if there were few dancers at the club on a weekday. *Id.* Ex. 8, Pleasants Dep. 43:6-44:3. DJs also tracked Plaintiffs' payment of stage fees and how many songs Plaintiffs performed to in private dances. *Id.* at 30:1-31:18; Ex. 10, Saye Dep. 23:11-24:1. DJs told White or Lewis if dancers did not make payments or left early. *Id.* Ex. 10, Saye Dep. 40:5-17; Ex., 8, Pleasants Dep. 34:4-14, 47:13-48:2. Linda Register, a bartender at the club, also reported issues with dancers to Lewis. *Id.* Ex. 9, Register Dep. 21:8-22:13. Defendant does not dispute this evidence, and it also shows that Plaintiffs' shifts were highly regulated and monitored.

As for the dance routines themselves, Plaintiff Hollis testified that "they were all ad libbed." Muñoz Mot. Decl. Ex. B, Hollis Dep. 137:9-11. They testified, "your dance routines would be determined by kind of your energy, your mood, what you felt like doing through the course of the performance." *Id.* at 138:2-8. Plaintiff Hollis also testified, "There is a written policy about how nude you have to be. They would tell you that you had to be topless by the second song and full nude by the third song." Spencer-Scheurich Resp. Decl. Ex. 4, Hollis Dep. 485:21-24. Similarly, Plaintiff Doe testified that during dances, "[y]ou had to remove your top by the end of the first song and your bottoms by the end of the second as long as there was a customer sitting at your stage." Muñoz Mot. Decl. Ex. D, Doe Dep. 25:11-14. When asked whether she could otherwise dance the way she wanted, Doe responded, "I suppose." *Id.* at 25:15-18. She explained, "There were times when I was told I needed to be doing more because there was a customer sitting at my stage even though they weren't tipping me." *Id.* at 26:1-4. Lewis testified that if a DJ reported to him that a dancer was not performing very well, "I would just—I would instruct the dancer, say, hey, if you really want people to come tip you, I'd say, you might want to consider, you know, performing. Spencer-Scheurich Mot. Decl. Ex. 6, Lewis

Dep. 144:2-18. The record shows that Defendant placed some constraints on the manner of performance and supervised Plaintiffs' performances, but also allowed Plaintiffs some freedom to dance the way they wanted.

The parties disagree on the degree of freedom Plaintiffs had to choose their own music. Plaintiffs assert that they could request songs or bring in playlists, but DJs ultimately controlled which songs they danced to. Pl. Mot. 21. The record supports this assertion. Murchie testified that he gave dancers the choice of what to dance to. Spencer-Scheurich Mot. Decl. Ex. 7, Murchie Dep. 65:19. He also testified that there were restrictions on music with "too much rap or hip hop," and Lewis would get angry with him if he played it. *Id.* at 65:19-21, 66:9-67:2. He testified that he personally would download a song if a dancer requested it and he didn't have it, but a lot of DJs would not do that. Muñoz Resp. Decl. Ex. A, Murchie Dep. 70:4-8, ECF 41. Pleasants testified that he tried to set up a playlist in advance but would often think of other songs to use during a shift. Spencer-Scheurich Mot. Decl. Ex. 8, Pleasants Dep. 42:9-23. He testified that he tried to "find a balance between what the girls liked dancing to and what the customers liked hearing." *Id.* at 22:6-8. The club had a catalog of music, and DJs selected from within that catalog. *Id.* at 23:24-24:6. It was rare for a dancer to bring in a song for him to play. *Id.* at 24:7-9. Sometimes Pleasants bought a song if a dancer requested it. *Id.* at 24:18-21. Another DJ, Roger Saye, testified, "When the girls come on, they are asked what type of music they prefer to dance to. And they can give us a playlist if they'd like, or if they just want to tell us their genre music, then we go from there and we play their music." Muñoz Reply Decl. Ex. E, Saye Dep. 17:1-5. Saye testified that the club would play any type of music but not "derogatory music." *Id.* at 17:6-18.

Lewis testified that the club would play any music that was "not offensive or derogatory music." Muñoz Resp. Decl. Ex. C, Lewis Dep. 125:4-5. He explained that offensive or derogatory music was music with "curse words, the wrong verbiage, like the 'N' word, derogatory towards women." *Id.* at 125:8-11. Plaintiff Hollis testified that they could request songs, and sometimes their requested songs were played, but sometimes they were not. Muñoz Mot. Decl. Ex. B, Hollis Dep. 121:12-18. The foregoing testimony shows that Plaintiffs had freedom to request or suggest songs, but that DJs and management exercised ultimate control over what was played. There are factual disputes over how often DJs would play the music a dancer requested and whether the club would play rap and hip hop, but the undisputed evidence shows that Plaintiffs did not ultimately control what was played.

Defendant asserts that Plaintiffs could choose their own outfits, hairstyle, and makeup. Def. Mot. 12. The evidence shows that Plaintiffs had partial freedom over their appearance. Murchie testified that dancers could wear what they wanted as long as they were "presentable." Muñoz Reply Decl. Ex. D, Murchie Dep. 82:5-9. Plaintiff Doe testified that she could choose her outfits "[w]ithin the parameters of what the club wanted me to wear[.]" Muñoz Mot. Decl. Ex. D, Doe Dep. 26:14-17. She testified that there were no written rules about what to wear and she was never talked to for wearing something the club did not approve of. *Id.* at 26:18-24. Plaintiff Hollis testified that Lewis "would walk in [to the dressing room] and say, you all need to have your makeup done before the shift starts. I want you to have a full face of makeup and look good." *Id.* Ex. B, Hollis Dep. 181:10-13. Plaintiff Hollis testified that they wore their natural hair one time at Club 205, Lewis asked them what was going on with their hair, and after that they wore a wig. *Id.* at 135:5-9; Spencer-Scheurich Resp. Decl. Ex. 11 (Hollis NLRB Decl.) 18:8-9. Plaintiff Hollis also testified that they wore a ponytail and were talked to about it and did not

wear it again. Muñoz Mot. Decl. Ex. B, Hollis Dep. 271:5-6. The record shows that Defendant set constraints on Plaintiffs' appearance, monitored their compliance with those constraints, and allowed them freedom within those constraints.

Defendant argues that Plaintiffs had the freedom to drink alcohol during their shifts. Def. Mot. 12. Plaintiff Hollis testified that they thought drinking was encouraged. Muñoz Mot. Decl. Ex. B, Hollis Dep. 269:1-5. They were unaware of any dancers being treated worse by the club for not drinking. *Id.* at 269:19-270:1. When asked, "if you did not want to solicit dances in between stage sets, you could take a break or have a drink or do whatever, correct?" Plaintiff Doe answered, "Yes." *Id.* Ex. D, Doe Dep. 31:14-17. Plaintiffs argue that Defendant benefitted from drinks that customers bought Plaintiffs, and thus it was in Defendant's interest for Plaintiffs to drink. Pl. Reply 21. A reasonable jury could conclude that Plaintiffs' testimony about drinking favors a finding that Plaintiffs were employees or that they were independent contractors or that it is neutral.

Defendant asserts that Plaintiffs were free to work at other clubs. Def. Mot. 12. Plaintiff Hollis testified that they were unaware of any written restrictions on dancers working at other clubs and did not recall any verbal communication suggesting that they could not work at other clubs. Muñoz Mot. Decl. Ex. C, Hollis Dep. 482:8-10, 16-19. They also stated, "I don't think it would have been feasible for me to work at another club with the shifts that I had to work." *Id.* at 483:11-13. Plaintiff Doe testified that Lewis never told her that she could not dance at other clubs. *Id.* Ex. D, Doe Dep. 123:24-124:2. Pleasants, one of Defendant's DJs, testified that for three and a half years of the time he worked for Defendant, he also worked at other venues. Spencer-Scheurich Resp. Decl. Ex. 8, Pleasants Dep. 56:18-24. Lewis testified that Defendant's DJs were treated as employees and received a paycheck. Spencer-Scheurich Mot. Decl. Ex. 6,

Lewis Dep. 28:15-16. Because the undisputed evidence shows that DJs, who were employees, could also work at other venues, Plaintiffs' right to do so is not probative of their status.

Plaintiffs point to evidence of Defendant's control over operation of the club. Pl. Mot. 21-24. Plaintiffs assert that Defendant maintained the physical space and controlled the hours, food menu, hiring, and advertising. *Id.* at 22. Defendant disputes none of this. Plaintiffs also assert that Defendant's bouncers decided who would be admitted to the club. *Id.* Davis, a security guard, listed reasons for which he would refuse entry, including wearing gang colors, aggressive behavior, and signs of intoxication. Spencer-Scheurich Mot. Decl. Ex. 1, Davis Dep. 33:10-34:18. Davis testified that he would explain the club rules to people who were entering. *Id.* at 32:13-33:9. Davis would also monitor the parking lot and do laps inside the club. *Id.* at 31:5-10. Davis testified that either he or Lewis would decide whether someone should be removed from the club. *Id.* at 46:20-47:25. Defendant does not dispute this evidence, and it shows that Defendant exercised control over the club atmosphere and the customers with whom Plaintiffs could interact.

Plaintiffs also argue that their sharing of tips with Defendant's DJs, bartenders, wait staff, and bouncers shows Defendant's control over the club because Defendant relied on Plaintiffs' sharing of tips to pay its staff minimum wage. Pl. Mot. 23. It is undisputed that Plaintiffs tipped club bartenders, DJs, and bouncers. Spencer-Scheurich Mot. Decl. Ex. 9, Register Dep. 23:1-2; Ex. 7, Murchie Dep. 68:13-24; Ex. 10, Saye Dep. 34:22-35:4; Ex. 1, Davis Dep. 65:22-25. Saye and Murchie both testified that they were earning minimum wage during the relevant period. *Id.* Ex. 10, Saye Dep. 33:18-34:5; Ex. 7, Murchie Dep. 65:3-5. There is also evidence that dancers did not always tip club employees and that club employees did not expect tips as a matter of course. Muñoz Reply Decl. Ex. E, Saye Dep. 35:16-36:13; Ex. G, Pleasants Dep. 54:12-21; Ex.

H, King Dep. 26:11-12. A reasonable jury could draw different inferences from the evidence about Defendant's pay structure. A jury could conclude that Plaintiffs were expected to share tips with Defendant's employees and were in fact subsidizing lower wages, as Plaintiffs suggest. A jury could also conclude that the shared tips were not automatically expected but gestures of appreciation from dancers to employees.

The Court concludes that the supervision and control factor favors finding that Plaintiffs were employees. The record shows that Defendant exercised considerable control over Plaintiffs' work schedule and performances and supervised them during their shifts. While the record suggests that Plaintiffs had some freedom in requesting shifts and in the manner of their performance and their appearance, control need not be absolute for Plaintiffs to be considered employees. Other than perhaps the method of scheduling, the freedom Plaintiffs had was freedom Defendant permitted them to exercise within constraints set by Defendant, not freedom Plaintiffs retained for themselves as independent businesspeople.

> b.    Opportunity for Profit or Loss Based on Managerial Skill

Defendant argues that this factor shows that Plaintiffs were independent contractors because their opportunity for profit or loss depended on their sales techniques in interacting with customers. Def. Mot. 12-13. Defendant asserts, "Because Plaintiffs were compensated based on direct customer contributions rather than a set fee or hourly wage by Club 205, Plaintiffs assumed the risk of profit or loss through the energy, skill, and practice that was put into their performances." *Id.* at 12. Defendant relies on three cases in which courts found that this factor weighed in favor of finding that exotic dancers were not employees: *Matson*, 2000 WL 1132110, at *4, *Hilborn v. Prime Time Club, Inc.*, No. 4:11CV00197 BSM, 2012 WL 9187581, at *1 (E.D.

Ark. July 12, 2012), and *State ex rel. Roberts v. Acropolis McLoughlin, Inc*., 150 Or. App. 180, 191 (1997).

Plaintiffs counter that "the managerial skills factor requires something more than hustling for tips." Pl. Resp. 23. They assert, "The focus should be on whether Plaintiffs had the type of managerial control to achieve significant profit or risk significant loss in the enterprise. Here, Plaintiffs' financial success depended disproportionately on Defendant's management decisions, not their own." *Id.* Plaintiffs argue that they "could at best request shifts when they thought they might be successful[.]" Pl. Mot. 35.

The Court agrees with Plaintiffs. As discussed above in addressing the first *Real* factor, the record shows that Plaintiffs' performances were constrained by Defendant and that they had to tailor their approach to the business model and atmosphere Defendant created. Plaintiffs' ability to use interpersonal sales techniques to win bigger tips or solicit private dances in that environment is not a managerial skill. It is similar to sales skills commonly utilized by employees in the service industry. Plaintiffs were situated similarly to servers in a restaurant or retail salespeople paid on commission. The fourth factor of the *Real* test addresses special skills, and the Court will address non-managerial skills in evaluating that factor. Defendant has not identified any managerial skills on which Plaintiffs' opportunities for profit or loss depended. The record does not reflect that Plaintiffs' income depended on their managerial skills. Other courts faced with similar facts have come to the same conclusion. *E.g.*, *Hurst v. Youngelson*, 354 F. Supp. 3d 1362, 1374 (N.D. Ga. 2019).

The cases on which Defendant relies are not compelling. *Matson* devotes two sentences to this factor: "Additionally, the plaintiff was paid exclusively through fees and tips for table dances, income which was largely dependent on the plaintiff's own skill to attract customers and

not on any salary or hourly wage set by the defendants. Through this method of compensation, the plaintiff was in control of her opportunity for profit." 2000 WL 1132110, at *4. The Court respectfully disagrees with this analysis. The skill of attracting customers as an exotic dancer in a strip club is not a managerial skill. Similarly, *Hilborn* states only that the plaintiffs "experienced certain risks of profit or loss beyond that which normal employees experience" and does not discuss the facts. 2012 WL 9187581, at *1. Finally, in *Acropolis*, the Oregon Court of Appeals looked at the skill of the dancer without noting any managerial skills. 150 Or. App. at 191. Because this factor addresses the opportunity for profit or loss based on managerial skills, and none of the cases that Defendant relies on address managerial skills, those cases are not persuasive. This factor favors finding that Plaintiffs were employees.

### c.    Investment in Premises, Equipment, and Materials

The undisputed record shows that Defendant's investment in the premises, equipment, and materials was more substantial than Plaintiffs' investment. Defendant argues that this factor favors a finding that Plaintiffs were independent contractors because "Plaintiffs personally invested in their own makeup, outfits, and wigs required for their performances and spent time each night preparing for their performances." Def. Mot. 13. Defendant also points out that Plaintiffs "invested in their own skills to improve their performances through practice and received and provided pole dancing instruction." *Id.* Plaintiffs counter that their investments are much less substantial that Defendant's investment. Pl. Resp. 21-22. Plaintiffs assert that "Defendant paid for the rental of the building, food and beverages, licenses, the music catalog, the DJs computer and sound equipment, wages of staff to run the operations, training for security guards, advertising, promotional items, bookkeeping, maintenance costs, janitorial services,

among other expenses." Pl. Mot. 31. Defendant does not dispute this. *See* Def. Resp. 12-13, ECF 40.

Defendant suggests that the premises should not be included in the analysis. Defendant points to *Acropolis*, which concluded that "[t]he stage that Acropolis provided was not equipment but the situs of the performance." 150 Or. App. at 191. This approach is inconsistent with Supreme Court caselaw. In *Rutherford*, the Supreme Court held that workers at a meat-packing plant were employees in part because "[t]he premises and equipment of [the employer] were used for the work." 331 U.S. at 730. Defendant's investment in and control over the premises is relevant. And even if it were excluded, Defendant's investment in the equipment listed above still outweighs Plaintiffs' investment. The music catalog, licenses, and sound equipment alone are a more significant investment.

Defendant also points to *Nelson v. Texas Sugars, Inc.*, 838 F. App'x 39 (5th Cir. 2020), which upheld a jury verdict that exotic dancers were not employees. The Fifth Circuit stated:

> [B]ecause the dancers provided their own costumes and makeup, the jury could conclude that this factor, too, weighed against employee status or was neutral. Specifically, although the Club made significant investments in, *inter alia*, advertising, décor, food, and alcohol, the jury could have concluded that those investments were not essential for the dancers to perform their work and thus the relative investments of the Club and the dancers were not necessarily comparable.

*Id.* at 42. *Nelson* did not mention investment in music equipment and licensing. On the record before this Court, no reasonable jury could conclude that music equipment and licensing were not essential for Plaintiffs to perform as exotic dancers for Defendant.

Finally, Defendant improperly includes the time Plaintiffs spent improving their performance abilities in the comparison of the parties' relative investments. Time spent improving skills is not part of materials, equipment, and premises. Plaintiffs' development of their skills is properly considered in the factors addressing skills. In sum, Plaintiffs' investment

in materials, equipment, and the premises was minimal compared to Defendant's. The Court

joins several other district courts in concluding that this factor favors a finding that Plaintiffs

were employees. *See Hurst*, 354 F. Supp. 3d at 1376 (collecting cases).

d.      Whether the Service Rendered Requires a Special Skill

Defendant argues that this factor favors a finding that Plaintiffs were independent

contractors because Plaintiffs were highly skilled performers who participated in state and

national competitions. Def. Mot. 14. Plaintiffs state that they "were experienced exotic dancers,

but Defendant exaggerates the evidence and significance of their training and conflates pole

dancing as an artistic pursuit with the actual skills necessary to make money while strip

dancing." Pl. Resp. 10. Plaintiffs argue that Defendant's focus on their performance skills is

incorrect because this factor focuses on "whether Plaintiffs' work required 'initiative, judgment,

or foresight' of a separate enterprise or whether the initiative was simply that of hustling

customers for tips." *Id.* at 22. Plaintiffs argue that their success depended on hustling a customer,

not pole dancing or having a business plan. *Id.* They argue that this is not a special skill. *Id.*

In *Torres-Lopez*, the Ninth Circuit looked at the nature of the work itself to determine

whether it required a special skill. 111 F.3d at 644 ("[T]he job of picking cucumbers is

'piecework' that requires no great 'initiative, judgment, or foresight,' or 'special skill'[.]")

(citation omitted). In *Rutherford*, the Supreme Court concluded that "[w]hile profits to the boners

depended upon the efficiency of their work, it was more like piecework than an enterprise that

actually depended for success upon the initiative, judgment or foresight of the typical

independent contractor." 331 U.S. at 730. But performance skills may also count as a special

skill. *See Bartels v. Birmingham*, 332 U.S. 126, 132 (1947) (holding that band leader and not

dance hall operator was employer of band members in part because "[i]t is his musical skill and

showmanship that determines the success or failure of the organization"); *Real*, 603 F.2d at 754 n.14 (citing *Bartels* in articulating the economic realities test). The Court therefore evaluates the two skills Defendant relies on: interpersonal sales skills and pole-dancing skills.

Plaintiffs cite several cases for the proposition that "[t]he skill of hustling for tips has been widely rejected as insufficient to demonstrate independence." Pl. Resp. 22 (citing *Levi v. Gulliver's Tavern Inc.*, No. CV 15-216 WES, 2018 WL 10149710, at *5 (D.R.I. Apr. 23, 2018); *Harrell v. Diamond A. Entm't, Inc.*, 992 F. Supp. 1343, 1350 (M.D. Fla. 1997); *Roldan v. PSLA LLC*, No. CV205638PSGKESX, 2021 WL 4690587, at *5 (C.D. Cal. July 2, 2021)). The Court agrees with these cases. As discussed above, many employees in the service industry also hustle for tips or use persuasive sales techniques to win commissions. This skill does not point toward independent contractor status.

While the parties dispute Plaintiffs' exact level of skill as exotic dancers, they agree that Plaintiffs are skilled performers. Def. Mot. 14; Pl. Resp. 10. There is a genuine dispute over whether Plaintiffs' level of skill was relevant to their earning potential. Plaintiff Hollis testified that they were able to get consistent shifts with Defendant because of their pole-dancing skills. Muñoz Mot. Decl. Ex C, Hollis Dep. 452:17-19. Plaintiff Doe testified that she did not have any training before she became an exotic dancer and that she went and auditioned because she had no other financial options. Spencer-Scheurich Resp. Decl. Ex. 2, Doe Dep. 15:24-16:3. When asked to define a skilled dancer, Plaintiff Doe stated, "most of dancing is really about sales. It's about your ability to connect with customers, have conversations, and convince them that the experience you're selling is worth their time and money. And with practice, you improve at that." *Id.* at 16:16-21. Plaintiff Doe stated, "I really enjoy pole dancing. It's not necessarily, like, an important aspect of stripping, but it is a hobby of mine that I work at and enjoy." *Id.* at 18:2-5.

Plaintiffs give opposing testimony about how important their pole-dancing skills were to their work for Defendant. In the light most favorable to Plaintiffs, this factor favors a finding that Plaintiffs were employees. In the light most favorable to Defendant, it favors a finding that Plaintiffs were independent contractors.

e.      Degree of Permanence of Working Relationship

Defendant argues that "Plaintiffs' work at Club 205 was impermanent. Every week, Plaintiffs could decide whether they wanted to work simply by submitting their respective availability to the scheduler." Def. Mot. 14. Defendant also points out that Plaintiffs could take time off to travel or work at other venues if they chose. *Id.* at 14-15. Plaintiffs counter that they "worked one to two years for Defendant, week after week, typically four or more days per week." Pl. Resp. 23. They agree that Plaintiff Doe took vacations but state, "no one is arguing that exotic dancers should not be entitled to vacations." *Id.* They also point out that one of Defendant's DJs, an employee, was allowed to and did work for other clubs. *Id.*

This factor slightly favors Plaintiffs. First, Defendant concedes that Plaintiff Doe danced at the club from December 2017 until March 2020, and Plaintiff Hollis danced at the club from May 2019 to March 2020. Def. Mot. 2; Compl. ¶¶ 8-9. Plaintiffs testified that they usually worked multiple shifts per week because they were required to work weekday shifts in order to obtain a weekend shift. Spencer-Scheurich Resp. Decl. Ex. 2, Doe Dep. 139:19-21; Ex. 4, Hollis Dep. 29:7-11. The length and frequency of the work points to an employment relationship. Second, Plaintiff Doe testified that when she took time off to travel and dance at other venues, she would have a club she could return to when she came back from her travel. Spencer-Scheurich Resp. Decl. Ex. 2, Doe Dep. 19:15-20:14. The time off was akin to a vacation an employee would take. Third, Pleasants, one of Defendant's DJs, testified that for three and a half

years of the time he worked for Defendant, he also worked at other venues. *Id.* Ex. 8, Pleasants

Dep. 56:18-24. Lewis testified that the club's DJs were employees and received paychecks.

Lewis Dep. 28:15-16. On this record, Plaintiffs' freedom to work at other jobs does not favor

either party.

On the other hand, it is undisputed that Plaintiffs could in theory decide not to work for

Defendant on any given week by not providing any availability for the week. That evidence

favors a finding that Plaintiffs were independent contractors. The general rule in Oregon is that

employment is at will and can be terminated by either party for any reason or no reason.

*Cocchiara v. Lithia Motors, Inc.*, 353 Or. 282, 290, 297 P.3d 1277 (2013). But a reasonable jury

could conclude that the parties' expectations of ongoing regular work were less than they would

be for the typical at will employment situation. This factor favors a finding that Plaintiffs were

employees, but not strongly.

f. Whether the Service Rendered is Integral to Business

Defendant asserts, "Plaintiffs – nor any performers – are not integral to Club 205's

business, or at least not any more so than any other event venue that equally uses a variety of

talented acts to populate and excite customers at event spaces. Club 205's business is based on

food and drink sales and lottery games." Def. Mot. 15. Plaintiffs counter that "Defendant's club

solely featured exotic dancers, and Plaintiffs performed there week in and week out." Pl. Resp.

24.

The undisputed evidence shows that exotic dancers were integral to Defendant's

business. In support of its position, Defendant cites Fleischmann's testimony that Defendant's

business is "a bar with a lottery." Muñoz Mot. Decl. Ex. E, Fleischmann Dep. 19:24.

Fleischmann also testified that since 1982, Club 205 had never operated as a bar with no exotic

dancing. Spencer-Scheurich Mot. Decl. Ex. 3, Fleischmann Dep. 130:3-9. Ample testimony from

Lewis confirms that Defendant billed itself as a venue in which customers could expect to see

exotic dancers, consistently featured exotic dancers, and derived significant income from

featuring exotic dancers. *See* Spencer-Scheurich Resp. Decl. Ex. 6, Lewis Dep. 20:16-21:3

(agreeing that Defendant's front sign regularly read "Hottest girls in town" with "dancers" in

large letters and "food and drink" in smaller letters beneath), 62:3-63:2 (explaining that the club

used all three stages on Thursday, Friday, and Saturday nights and used one to two stages at a

time on other days of the week), 63:21-25 (stating that Defendant was earning $10,000 to

$11,000 per week in stage fees before the pandemic), 80:19-25 (stating that customers patronized

the club because "we normally have decent dancers" and "[w]e usually always have dancers at

all times").

    This factor encompasses the *Torres-Lopez* factor addressing whether the work was a

specialty job on the production line. The "specialty job" factor derives from *Rutherford*, in which

the Supreme Court concluded that workers who removed the bones from meat "did a specialty

job on the production line" at a meat-packing plant. 331 U.S. at 730. This inquiry is the same as

whether Plaintiffs were integral to the business. Plaintiffs treat the two factors similarly. Pl. Mot.

29-30. Defendant does not address this factor. The record shows that Plaintiffs performed

particular duties that were unique to them and integral to Defendant's business model. This

consolidated factor strongly favors a finding that Plaintiffs were employees.

    In sum, five of the six *Real* factors favor a finding that Plaintiffs were employees of

Defendant, even if the facts are viewed in the light most favorable to Defendant. In the light most

favorable to Plaintiffs, all six *Real* factors favor a finding that Plaintiffs were employees. In

particular, the key first factor shows that Defendant exercised considerable control over

Plaintiffs. Defendant points to Plaintiffs' statements that they were independent contractors and its employees' understanding that dancers were contractors. Def. Reply 7-9. But contractual labels and the subjective intent of the parties "cannot override the economic realities reflected in the factors described above." *Real*, 603 F.2d at 755. To complete its evaluation of Plaintiffs' Motion, the Court proceeds to evaluate the five *Torres-Lopez* factors not encompassed by the *Real* factors.

### g.    Power to Determine Pay Rates or Method of Payment

Plaintiffs assert that Defendant exercised control over their compensation by charging stage fees and setting the length and timing of shifts, setting the rotation, and determining how many songs the dancers could perform to each time they went on stage. Pl. Mot. 26. They also point to the minimum fee for private dances. *Id.* It is undisputed that Plaintiffs' compensation from dancing for Defendant came in the form of tips and private dance fees. It is also undisputed that while Defendant set minimum private dance fees, there was no maximum, and that Plaintiffs could choose whether to perform private dances. Defendant thus exercised a considerable degree of control over the methods of payment and pay rates for Plaintiffs, but the control was not absolute. This factor slightly favors a finding that Plaintiffs were employees.

### h.    Right to Hire, Fire, or Modify Employment Conditions

Plaintiffs argue that Defendant had the right to hire, fire, and modify employment conditions through the scheduling process. Pl. Mot. 27-29. It is undisputed that Defendant had the right to hire, and that hiring was done through auditions both when White was in charge and when Lewis was in charge. The continuity favors a finding that Plaintiffs were employees. As for firing, Lewis testified that if a dancer missed a shift, nothing would happen, but that he might or might not schedule that dancer for future shifts. Spencer-Scheurich Mot. Decl. Ex. 6, Lewis Dep.

68:20-69:8. He stated that he would need to be "able to get ahold of them and see if they are going to show up for the next shift. If they showed up for the next shift, most likely they kept working." *Id.* at 69:9-13. Lewis also stated that he sometimes did not respond to dancers' requests for shifts if the dancer "was causing problems within a club or something like that." *Id.* at 70:20-71:1. He identified drug use and fighting as reasons he would not respond to a dancer. *Id.* at 71:2-14. When White was alive, Lewis communicated with him about dancers "[o]nce or twice every three days." *Id.* at 44:18-45:18. Defendant does not dispute Lewis's testimony. It shows that Defendant maintained the right to effectively fire dancers by refusing to schedule them for shifts.

As for modification of employment conditions, Plaintiffs point to monthly contests and weekly promotions that Defendant instituted. Pl. Mot. 28. Lewis testified that the club had costume parties, and the dancers were allowed but not required to participate. Spencer-Scheurich Mot. Decl. Ex. 6, Lewis Dep. 78:5-16. It is not clear that these events changed Plaintiffs' employment conditions. Plaintiffs also point to Defendant's power to control which customers were allowed to enter and remain in the club. Pl. Mot. 28. They also point out that Defendant set house rules that it communicated to customers through bartenders. *Id.* at 28-29. Davis testified that he would tell customers the rules as they entered; the rules included restrictions on smoking and drinking, as well as no pointing phones or cameras at the stage, no touching, and "[i]f you are looking, you are tipping." Spencer-Scheurich Mot. Decl. Ex. 1, Davis Dep. 32:22-33:4. Because the evidence shows that Defendant had the power to hire and fire Plaintiffs, as well as control the club environment, this factor favors a finding that Plaintiffs were employees.

//

//

i.    Preparation of Payroll and Payment of Wages

It is undisputed that Plaintiffs were not part of Defendant's payroll and that they earned their income through tips and private dance fees paid directly from customers. The Court concludes that this factor is not probative in this case. An employer's decision to label workers as independent contractors and exclude them from payroll says little about whether the workers are functionally employees. Other courts have come to the same conclusion. *E.g.*, *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 925 (S.D.N.Y. 2013).

j.    Whether Contracts Pass Without Material Change

This factor derives from *Rutherford*. In *Rutherford*, the team leader's contract with the putative employer transferred to successive team leaders without material alteration, which supported a finding that the workers were employees. 331 U.S. at 725, 730. Plaintiffs argue that there is no evidence that they could individually negotiate the terms of their working relationship with Defendant. Pl. Mot. 30. They point to the club's set shift and rotation system, the risk of not being scheduled if they did not follow the rules, and bouncers' and DJs' monitoring of their attendance and behavior. *Id.* On the other hand, as Defendant points out, Plaintiffs had some freedom to request the shifts they wanted and not request the shifts they did not want. Because the Court has addressed all of this evidence in addressing other factors, it need not address it again here. Plaintiffs also state that nothing significant changed in terms of how they were scheduled or their work at the club after Lewis took over scheduling from White. *Id.* at 31. Lewis testified that when he took over from White, he used the schedule White had already made to gain contact with dancers White was in contact with. Spencer-Scheurich Mot. Decl. Ex. 6, Lewis Dep. 57:7-24. As discussed above, Lewis used the same scheduling system as White. Defendant does not address this factor. It favors a finding that Plaintiffs were employees.

k.      Whether Workers Had a Business Organization

This factor is also from *Rutherford*. In *Rutherford*, the workers "had no business organization that could or did shift as a unit from one slaughter-house to another," which favored a finding that they were employees. 331 U.S. at 730. Here there is no evidence that either Plaintiff had their own business organization or was part of a business organization while they were working at Club 205. Plaintiffs also testified that they did not know that White was part of a separate business from Defendant until after they sued Defendant, and they thought that White was part of Defendant's management. Spencer-Scheurich Mot. Decl. Ex. 2, Doe Dep. 36:12-25; Ex. 4, Hollis Dep. 124:20-125:8. As discussed above, White and Lewis collaborated closely while White was alive and used the same scheduling procedures. This factor favors a finding that Plaintiffs were employees.

In sum, the majority of the factors favor a finding that Plaintiffs were employees rather than independent contractors. The first factor, the degree of control and supervision, is the most important. Even when the facts are viewed in the light most favorable to Defendant, the record shows that Defendant exercised considerable control over Plaintiffs' schedule, working conditions, and performances. To the extent that Plaintiffs had freedom within those constraints, it was mostly a freedom Defendant permitted Plaintiffs to exercise, not freedom Plaintiffs retained as independent workers. Defendant also had the power to hire and fire Plaintiffs and set constraints on how they could earn money. Plaintiffs were not part of any separate business entity, and their success did not rely on any managerial skills. They were integral to Defendant's business, and Defendant made the more significant investment in premises, equipment, and materials. Even when the facts are viewed in the light most favorable to Defendant, the evidence

shows that Plaintiffs were employees under the economic realities test. Thus, Plaintiffs are employees for the purposes of their FLSA claims.

It is undisputed that Defendant did not pay Plaintiffs any wages. That failure violates the FLSA's minimum wage provisions. But Plaintiffs are not entitled to summary judgment on their FLSA minimum wage claims because it is for a jury to decide whether Defendant's violation was willful and thus whether the claims were timely. *See Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918-19 (9th Cir. 2003) (evaluating whether there was a genuine dispute of material fact on the willfulness of the defendant's FLSA violations).

iv.    Kickback Claims

As part of their FLSA claims, Plaintiffs allege: "The fees that Defendant required Plaintiffs to pay were expenses that were primarily for the benefit of the employer, resulting in illegal kickbacks to Defendant under 29 C.F.R. § 531.35." Compl. ¶ 61. Defendant argues that the stage fees and private dance fees it charged Plaintiffs were not illegal kickbacks because they were lawful charges for use of club space for performances. Def. Mot. 16 (citing *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 897 (9th Cir. 2013); 29 U.S.C. § 203(m); 29 C.F.R. § 531.3(d)). Plaintiffs counter that Defendant has not met its burden to show that it properly charged those fees. Pl. Resp. 27-28.

Under the FLSA, a "[w]age paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging or other facilities are customarily furnished by such employer to his employees[.]" 29 U.S.C. § 203(m)(1). A reasonable cost may not exceed the actual cost to the employer and does not include a profit to the employer. 29 C.F.R. § 531.3(a)-(b). The cost of furnishing facilities that are "primarily for the benefit or convenience of

the employer will not be recognized as reasonable and may not therefore be included in computing wages." *Id.* § 531.3(d)(1). Examples of facilities primarily for the benefit or convenience of the employer include but are not limited to: "(i) Tools of the trade and other materials and services incidental to carrying on the employer's business; (ii) the cost of any construction by and for the employer; (iii) the cost of uniforms and of their laundering, where the nature of the business requires the employee to wear a uniform." *Id.* § 531.3(d)(2).

Plaintiffs correctly identify two problems with Defendant's argument. Pl. Resp. 27-28. First, Defendant has produced no evidence that the amount of fees charged was reasonable. Second, Defendant has not shown that it was reasonable to charge the fees at all. The fees were charged for use of Defendant's stages and private dance rooms. Lewis testified that the club earned $10,000 to $11,000 per week in stage fees before the pandemic. The use of the employer's place of business to perform work from which the employer derives profit is the type of cost that is primarily to the benefit of the employer under the regulations. Defendant is not entitled to summary judgment on Plaintiffs' FLSA kickback claims. The Court now turns to Plaintiffs' Oregon wage claims.

B.    Oregon Wage Claims

Plaintiffs allege that Defendant violated Oregon wage and hour laws by failing to pay the state minimum wage for hours worked and failing to timely pay all wages owed upon termination. Compl. ¶¶ 64-71. Under the minimum wage statute, "for each hour of work time that the employee is gainfully employed, no employer shall employ or agree to employ any employee at wages computed at a rate lower than" the prescribed minimum wage. O.R.S. 653.025(1). "[T]o prevail on a claim under that statute, a plaintiff must prove two elements: first, the plaintiff was employed by the defendant; and second, the plaintiff performed work for which

he or she was not compensated at the applicable minimum wage rate." *State ex rel. Roberts v. Bomareto Enterprises, Inc.*, 153 Or. App. 183, 188 n.4, 956 P.2d 254 (1998). Oregon law also provides: "When an employer discharges an employee or when employment is terminated by mutual agreement, all wages earned and unpaid at the time of the discharge or termination become due and payable not later than the end of the first business day after the discharge or termination." O.R.S. 652.140(1).

Like the FLSA, the Oregon minimum wage statute provides that "'[e]mploy' includes to suffer or permit to work[.]" O.R.S. 653.010(2). The Oregon Court of Appeals has indicated that the economic realities test applies to minimum wage claims under the Oregon minimum wage statute. *Cejas Com. Interiors, Inc. v. Torres-Lizama*, 260 Or. App. 87, 103, 316 P.3d 389 (2013). Oregon follows the federal economic realities test. *Id.* The Court therefore holds that Plaintiffs were employees under the Oregon minimum wage statute. Defendant does not raise any other challenge to Plaintiffs' Oregon minimum wage claims. It undisputed that Defendant did not pay Plaintiffs any wages for the shifts they worked. Accordingly, Plaintiffs are entitled to summary judgment on their claims under O.R.S. 653.025(1).

Defendant asserts that it did not willfully violate Oregon wage and hour laws. Def. Mot. 10; Def. Resp. 16-17. Plaintiffs correctly point out that the willfulness requirement for Oregon wage and hour law applies to penalty wages. Pl. Resp. 16 (citing O.R.S. 652.150). Plaintiffs did not move for summary judgment on their right to penalty wages under Oregon law. The Court therefore addresses only whether Defendant is entitled to summary judgment on this issue.

Oregon law provides that "if an employer willfully fails to pay any wages or compensation of any employee whose employment ceases, . . . then, as a penalty for the nonpayment, the wages or compensation of the employee shall continue from the due date

thereof at the same hourly rate for eight hours per day until paid or until action therefor is commenced." O.R.S. 652.150(1). This Court recently addressed the Oregon willfulness standard. *Eisele v. Home Depot U.S.A., Inc.*, 643 F. Supp. 3d 1166, 1177 (D. Or. 2022). Willfulness requires a knowing, intentional act or omission, but does not require malice. *Id.* "An employer, then, willfully fails to pay wages owed at termination only if it is fully aware of its obligation to do so but nonetheless consciously and voluntarily decides not fulfill that obligation." *Id.* (internal quotations omitted) (cleaned up).

Defendant acknowledges that the willfulness standard under Oregon law "is nearly identical" to the federal standard. Def. Mot. 10. The same evidence of willfulness for Plaintiffs' FLSA claims thus creates a genuine dispute over willfulness for Plaintiffs' claim to penalty wages. In arguing otherwise, Defendant relies on the result in *Eisele*, where this Court found that the employer's rounding policy did not result in a willful failure to pay wages because the law on rounding policies was uncertain. 643 F. Supp. 3d at 1180. In particular, two courts in California had approved the defendant's rounding program. *Id.* The Court finds no similar uncertainty here. At oral argument, Defendant pointed to *Matson* and *Acropolis*, but could not produce evidence that it relied on those cases at the time Plaintiffs danced at the club. The 2018 memo Defendant sent to its staff about how to treat dancers shows that Defendant was aware of the distinction between employees and independent contractors. Given the degree of control Defendant actually exercised over Plaintiffs, a reasonable jury could conclude that Defendant was aware that it was treating Plaintiffs like employees and therefore was required to pay them a wage, but consciously and voluntarily decided not to pay Plaintiffs any wages. Defendant is not entitled to summary judgment on Plaintiffs' claim for penalty wages.

II.    **Defendant's Motion for Summary Judgment on Plaintiffs' Retaliation Claims**

Defendant moves for summary judgment on Plaintiffs' retaliation claims. Plaintiffs bring a federal claim under Title VII and a state-law claim under O.R.S. 659A.030(f) for retaliation based on opposition to race and sex discrimination. Compl. ¶¶ 54-57. They also bring a claim for whistleblower retaliation under Oregon law, alleging that they were terminated for good faith reporting about Defendant's failure to address race discrimination and sexual assault. *Id.* ¶¶ 58-59. Defendant makes four arguments in favor of its Motion: (1) Plaintiffs were independent contractors and not employees, (2) Plaintiffs were not terminated but chose not to return to work, (3) Plaintiffs did not report any race discrimination, and (4) Defendant appropriately handled all reports of sexual harassment and assault. Def. Mot. 17-20. At oral argument, Defendant argued more generally that Plaintiffs did not engage in protected activity. The Court addresses Plaintiffs' federal claim and then their state-law claims.

A.    Federal Claim

Under Title VII, it is unlawful for an employer to discriminate against an employee because the employee has opposed a practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). Title VII forbids both race and sex discrimination in employment. *Id.* § 2000e-2(a).

i.    Employment Test

To determine whether a worker is an employee or an independent contractor under Title VII, courts use the common law agency test, which focuses on "'the hiring party's right to control the manner and means by which the product is accomplished.'" *Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 945 (9th Cir. 2010) (quoting *Nationwide Mut. Insurance Co. v. Darden*, 503 U.S. 318, 323 (1992)). Courts are to consider the following twelve factors:

[1] the skill required; [2] the source of the instrumentalities and tools; [3] the location of the work; [4] the duration of the relationship between the parties;

[5]  whether the hiring party has the right to assign additional projects to the hired party; [6] the extent of the hired party's discretion over when and how long to work; [7] the method of payment; [8] the hired party's role in hiring and paying assistants; [9] whether the work is part of the regular business of the hiring party; [10] whether the hiring party is in business; [11] the provision of employee benefits; and [12] the tax treatment of the hired party.

*Id.* at 945-46.

Defendant relies on the same arguments and evidence for the Title VII claim that it relied on for the FLSA claim. Def. Mot. 17-18. Defendant does not address the twelve factors. Factors 1, 2, 3, 4, 6, and 9 overlap with the six factors of the *Real* test, and in the light most favorable to Plaintiffs, they favor a finding that Plaintiffs were employees. As for the other factors, because Defendant did not brief them, the Court will only address them to the extent that the economic realities analysis covers them. Factors 7 and 12 may favor a finding that Plaintiffs were independent contractors, but the Court finds them to be of little weight here. Defendant did not adequately address factors 5, 8, 10, and 11. Defendant has not met its burden to show that Plaintiffs were independent contractors under the common law agency test.

      ii.    Prima Facie Case

Defendant argues that even if Plaintiffs were employees, they cannot make a prima facie case of retaliation. Def. Mot. 18-20. To make a prima facie case of retaliation under Title VII, Plaintiffs must show "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). Defendant argues that Plaintiffs cannot meet the first two elements.

With respect to the first element, Defendant argues that neither Plaintiff made any reports of race discrimination. Def. Mot. 19. Plaintiff Doe testified that she was not subject to race discrimination while working for Defendant, but stated that she "witnessed extreme racial discrimination." Muñoz Mot. Decl. Ex. D, Doe Dep. 44:5-9. As an example, she explained that

one time she asked a bouncer to remove a group of Proud Boys from the club and the bouncer refused to remove the Proud Boys and stated that if he had the option, he would not let Black people into the club because all they did was sell crack. *Id.* at 44:13-18. She stated that on another occasion a dancer who was half-Japanese was on stage, and a group of Asian customers was throwing her a lot of money, and White "grabbed a role of tape and handed it to me and said, quick, tape up your eyes before you get on stage." *Id.* at 44:19-24. Plaintiff Hollis testified that Club 205 was the best option for dancers of color "[t]o get hired, not for treatment." *Id.* Ex. C, Hollis Dep. 393:9-15. The record contains evidence of race discrimination at Club 205, but not evidence that Plaintiffs reported it. Defendant's argument is still unavailing because the protected activity Plaintiffs allege is not that they reported race discrimination they personally experienced. *See* Compl. ¶ 54. Similarly, Defendant's argument that it cannot be liable because it promptly responded to allegations of sexual assault at the club, Def. Mot. 19-20, fails to address the basis of Plaintiffs' claims.

Plaintiffs argue that they engaged in protected activity by asking Defendant to address race discrimination and sexual assault at Club 205 generally as part of the Stripper Strike. Pl. Resp. 33-34. Plaintiff Hollis texted Lewis on June 8, 2020, to ask him if he had heard about the PDX Stripper Strike. Spencer-Scheurich Resp. Decl. Ex. 6, Lewis Dep. Ex. 8 at 2. Also on June 8, Plaintiff Hollis posted on social media in support of the Stripper Strike, asking people to boycott clubs and posting the following statement: "The clubs don't open until we say so. Commit to defunding the PPD or no butts on stage in Portland Oregon." Muñoz Mot. Decl. Ex. B, Hollis Dep. Exs. 6, 13. Hollis continued posting on social media in support of the Stripper Strike. *Id.* Ex. 13.

On June 10, 2020, Lewis responded to Plaintiff Hollis, "I'll be reaching out later today." Spencer-Scheurich Resp. Decl. Ex. 6, Lewis Dep. Ex. 8 at 2. The same day, Plaintiff Hollis responded, "Thank you so much. I am helping coordinate some of it and really all we're asking for is that you implement cultural sensitivity training into your hiring process for your staff and management. And sit down for one of our listening sessions which has not been planned yet." *Id.* at 3. Plaintiff Hollis also told Lewis that the city provided free trainings. *Id.* Lewis responded, "I'll look in to it." *Id.* at 4. Plaintiff Hollis also sent Lewis a proposed statement to post on the club's public Instagram account. *Id.* The statement read, "We stand with striking strippers working towards equitable working conditions for strippers in Portland. We're working on anti-racist accountability and restorative justice because Portland deserves the best. More to come!" *Id.* Plaintiff Hollis later resent the list of requests. *Id.* at 5.

Plaintiff Hollis also communicated with Fleischmann about the Stripper Strike. They texted her about it beginning on June 11. Spencer-Scheurich Resp. Decl. Ex. 3, Fleischmann Dep. Ex. 21 at 1. They also emailed Fleischmann about cultural sensitivity training and sent recommendations, which Fleischmann forwarded to Lewis. *Id.*, Fleischmann Dep. 118:21-119:2. Fleischmann testified that she forwarded the emails to Lewis because she did not have time to deal with them. *Id.* at 119:2-5. She did not know whether Lewis later did anything with the emails. *Id.* at 119:16-17. On June 18, Fleischmann texted Plaintiff Hollis that she did not have authority to sign up for the cultural sensitivity trainings, but stated, "We are defiantly [sic] going to educate our staff." *Id.* Ex. 21 at 26. On June 20, 2020, Plaintiff Hollis texted Lewis, "Hey Dale. I'm still contracted with you at 205 and I'd like shifts next week." *Id.* Ex. 6, Lewis Dep. Ex. 8 at 5. Lewis did not respond.

On June 10, 2020, Lewis texted Plaintiff Doe to ask for her schedule requests for the

weekend. Spencer-Scheurich Resp. Decl. Ex. 6, Lewis Dep. Ex. 4 at 5. Plaintiff Doe responded:

> Hi dale! I am participating in the PDX Stripper Strike. We're asking for accredited
> racial sensitivity training for all staff members first and foremost. I hope you know
> that I'm a part of this because I love 205, want the best for it as a business, and
> think we can do more for our community. It's my home, and I want my home to be
> the best that it can be for everyone. I'm very excited to come back to work once we
> have this sorted out! Miss you and the club very much [heart emoji].

*Id.* Lewis did not text Plaintiff Doe again to offer shifts. Lewis Dep. 217:20-22; 219:3-6. Plaintiff

Doe testified, "I fully expected that [Club 205] would comply because every other club I was

seeing was complying. So I did not expect that I would be fired." Muñoz Mot. Decl. Ex. D, Doe

Dep. 128:20-23. Plaintiff Doe did not communicate further with Defendant about returning to

work. *Id.* at 129:11-13. Plaintiff Doe later posted on Instagram, "After that All Lives Matter BS I

won't be going back to 205." *Id.* at 133:9-10. At some point during the Stripper Strike,

Defendant posted an "All Lives Matter" sign on its marquee. Spencer-Scheurich Resp. Decl. Ex.

10, Saye Dep. 43:10-20. Plaintiff Doe testified, "I posted because I was hurt. But if the club had

reached out to me, I probably still would have gone back." Muñoz Mot. Decl. Ex. D, Doe Dep.

133:16-18.

On June 24, 2020, Fleischmann emailed the Portland Stripper Strike Collective on behalf

of Defendant. Spencer-Scheurich Resp. Decl. Ex. 3, Fleischmann Dep. Ex. 23. The email stated

that "Club 205 is committed to equality and racial justice" and that the club was "committed to

providing ongoing training opportunities for club management and employees." *Id.* The email

also stated that "while it appears that the interests of your group and our business are aligned on

several fronts, we do not feel that we know enough about your organization, its leadership, and

its goals to commit to an ongoing partnership or align ourselves with your organization." *Id.* It

continued: "We also are not able to prospectively agree to publishing your organization's

literature to Club 205 employees or to 'advise all staff to read the provided literature and/or attend listening sessions,' as we do not know the content of the publications your organization would propose." *Id.*

Plaintiffs argue that their request for Defendant to engage in cultural sensitivity training and listening sessions constitutes protected activity. Pl. Resp. 33. They rely on *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008 (9th Cir. 1983). In *Crown Zellerbach*, a group of Black employees wrote a letter to a school district protesting an award that the district planned to give to their supervisor. *Id.* at 1010-11. The letter stated that the supervisor should not be given the award because he was "the Standard Bearer of the bigoted position of racism at Zellerbach Paper Company." *Id.* at 1011. It mentioned past complaints of discrimination filed against the employer with the EEOC. *Id.* The letter also stated, "We would like an immediate reply from you explaining why you failed to look at Zellerbach's Total Affirmative Action Picture." *Id.* The letter was distributed to officials at Crown Zellerbach and the school district. *Id.* The employees were fired because of the letter. *Id.*

The Ninth Circuit identified three difficulties with the letter: (1) it complained of discrimination generally at the corporation rather than denouncing specific instances of discrimination; (2) it was worded primarily as a protest against the award and only secondarily as a protest against the corporation's policies; and (3) it was directed to an outside party rather than the corporation's decisionmakers or an appropriate government official. *Id.* at 1012. Despite these difficulties, the Ninth Circuit concluded that the letter was protected activity. *Id.* at 1013. The Ninth Circuit stated, "the employee's statement cannot be 'opposed to an unlawful employment practice' unless it refers to *some* practice by the employer that is allegedly unlawful." *Id.* It then concluded that the reader could discern the allegedly unlawful practice

from the letter's contents, which mentioned a history of unlawful employment practice complaints filed against the corporation by Black employees. *Id.* Delivery of the letter only to an outside party was not a bar to the claim. *Id.* at 1014.

Plaintiffs assert that their statements, demands, and requests to Lewis and Fleischmann constituted protected activity like the letter in *Crown Zellerbach*. Pl. Resp. 34. The Court disagrees. The letter in *Crown Zellerbach*, while not identifying a specific instance of racism by the employer, decried racism at the company and pointed to a history of complaints filed with the EEOC, providing context for the employees' complaint. Here, in contrast, the record shows that the Stripper Strike focused on strip clubs in Portland generally, making the same demands of all of them. *E.g.*, Muñoz Mot. Decl. Ex. B, Hollis Dep. Exs. 6, 13. The Stripper Strike used common social media posts with the same demands directed toward all clubs. *Id.* There is no evidence that Plaintiffs identified any discriminatory practices by Defendant as part of their communications with Defendant about the Stripper Strike. The record contains no evidence that Plaintiffs contacted Defendant's management to complain about racism or sexism before or during the strike such that the unlawful practices might have been apparent to Defendant. And Plaintiffs concede that they did not contact state or federal agencies to complain about discrimination until April 2021, after they stopped working for Defendant. Compl. ¶ 41.

In sum, the record shows that Plaintiffs asked for Defendant to participate in cultural sensitivity training and a listening session as part of a general movement for equity in the industry. While Plaintiffs may have connected those requests to some of Defendant's practices in their own minds, there is no evidence that the connection was made apparent to Defendant. Plaintiffs have failed to show that they engaged in protected activity. *See Barnes v. Saul*, 840 F. App'x 943, 946 (9th Cir. 2020) (holding that plaintiff failed to show that she engaged in

protected activity based on her blog featuring articles about age discrimination because the articles were general and did not oppose any discriminatory practices by the employer);

*Carrasco v. San Ramon Valley Unified Sch. Dist.*, 258 F. App'x 114, 115 (9th Cir. 2007) (holding that plaintiff's "vague" petition opposing employer's treatment of plaintiff's supervisor but making no reference to discrimination by employer did not constitute protected activity). Because Plaintiffs have failed to show that they engaged in protected activity, they have failed to make a prima facie case of discrimination under Title VII. The Court will assess the rest of the elements of the prima facie case in the interest of completeness.

With respect to the adverse action, a reasonable jury could conclude that Plaintiff Hollis was terminated. While they did make demands of Defendant, they also texted Lewis to ask for shifts, an indication that they still wanted to work for Defendant. Defendant argues that Plaintiff Hollis's repeated communications to Lewis about the Stripper Strike "made clear their intent to refuse to work at Club 205 unless it agreed to their demands." Def. Reply 10. Defendant also argues that Plaintiff Hollis's text message asking for shifts did not comport with the usual method of scheduling shifts. *Id.* n.1. A reasonable jury could decide that Plaintiff Hollis was not terminated, but that is not the only reasonable conclusion on this record. In the light most favorable to them, Plaintiff Hollis was terminated.

However, the record shows that Plaintiff Doe was not terminated. Plaintiff Doe's text message to Lewis conditioned her return to work on Defendant acceding to the demands of the Stripper Strike. Plaintiff Doe may have had a more nuanced view of her text message, but when Lewis did not respond, Plaintiff Doe did not contact him to negotiate further or indicate her willingness to return to the club. Both parties rely on communications that there is no evidence Defendant was aware of. Plaintiff Doe's Instagram post is not probative of Defendant's

perspective as to whether Plaintiff Doe was willing to return to work because there is no evidence that Defendant's management saw the Instagram post around the time it was posted. Plaintiffs assert that Plaintiff Doe was aware of Plaintiff Hollis's communications with Lewis. Pl. Resp. 36. But there is no evidence that Defendant was aware of communications between Plaintiffs, and they are not probative of Defendant's intent as to Plaintiff Doe. Plaintiff Doe was not terminated. For this additional reason, Defendant is entitled to summary judgment on the Title VII claim as asserted by Plaintiff Doe.

Finally, a reasonable jury could infer causation based on the proximity in time between Plaintiffs' communications and Defendant's lack of further communications with Plaintiffs, as well as other circumstantial evidence. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). Approximately two weeks passed between when Plaintiffs began communicating with Defendant about the Stripper Strike and when Defendant sent the email declining to align itself with the Stripper Strike. By that point, Defendant had ceased communicating with Plaintiffs about coming into work. A jury could infer based on the lack of further communication to Plaintiffs and the email from Defendant to the Stripper Strike collective that Defendant stopped asking Plaintiffs in to work because Plaintiffs were aligned with the Stripper Strike. Plaintiffs also point to evidence that Lewis was hostile to the Stripper Strike. Pl. Resp. 38. When asked why he objected to aligning with the Stripper Strike, Lewis testified, "I don't think we should abide to someone else's demands." Spencer-Scheurich Resp. Decl. Ex. 6, Lewis Dep. 190:3-6. He continued, "I don't believe that she [Plaintiff Hollis] should be boycotting clubs because they don't follow her demands. I didn't feel that anybody had to follow her demands. I felt Club 205 was doing a very good job in all these areas, and I – we didn't need someone else to demand what we should be doing as a business." *Id.* at 190:14-17. A reasonable jury could find causation based on this

evidence. In sum, while both Plaintiffs have established causation, they have both failed to show that they engaged in protected activity, and Plaintiff Doe has failed to show an adverse action. Defendant is entitled to summary judgment on Plaintiffs' Title VII retaliation claim.

       B.       State-Law Claims

Plaintiffs bring state-law retaliation claims under O.R.S. 659A.030(f), for retaliation for opposing race and sex discrimination, and O.R.S. 659A.199, for whistleblower retaliation. Compl. ¶¶ 56-59.

       i.       Employment Test

Oregon's employment discrimination statute uses the "right to control" test to determine whether a worker is an employee. O.R.S. 659A.001(4)(a) ("'Employer' means any person who in this state, directly or through an agent, engages or uses the personal service of one or more employees, reserving the right to control the means by which such service is or will be performed."); *Cantua v. Creager*, 169 Or. App. 81, 92, 7 P.3d 693 (2000). "Four factors are material in determining whether an employer has the right to control an individual: (1) direct evidence of the right to, or the exercise of, control; (2) the method of payment; (3) the furnishing of equipment; and (4) the right to fire." *Cantua*, 169 Or. App. at 92 (internal quotations and alterations omitted).

Defendant does not address this test, relying on the same arguments and evidence as for the economic realities test. Def. Mot. 17-18. Plaintiffs do not address the test either. The Court will address this test briefly in light of the discussion on the economic realities test, which encompasses the four factors. The first factor favors a finding that Plaintiffs were employees. As discussed above, Defendant exercised considerable control over Plaintiffs. The second factor is neutral. While Plaintiffs were not paid a wage, which could support a finding that they were

independent contractors, Defendant controlled the work environment and partially controlled the payment structure. The third factor favors a finding that Plaintiffs were employees because Defendant furnished most of the equipment and materials. The fourth factor favors a finding that Plaintiffs were employees when viewed in the light most favorable to Plaintiffs, as Defendant could effectively fire Plaintiffs by not responding to requests for shifts or otherwise refusing to schedule them for shifts. In the light most favorable to Plaintiffs, they were employees under the right to control test. The Court turns to whether Plaintiffs have made a prima facie case.

    ii.  Prima Facie Case

For their claim based on opposing race and sex discrimination, Plaintiffs must show (1) they engaged in the protected activity of complaining of discrimination, (2) they were subject to discriminatory action, and (3) the discriminatory action was taken against them because of the protected complaint. *Medina v. State of Oregon*, 278 Or. App. 579, 588, 377 P.3d 626 (2016). Claims under O.R.S. 659A.030(f) are substantially similar to a claim under Title VII and may be analyzed with that claim. *Meyer v. State by & through Oregon Lottery*, 292 Or. App. 647, 678, 426 P.3d 89 (2018). Thus, Plaintiffs have failed to make a prima facie case on their claim under O.R.S. 659A.030(f) for the reasons discussed in addressing their Title VII claim.

Oregon prohibits discrimination in employment when "the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation." O.R.S. 659A.199(1). For their whistleblower retaliation claim, Plaintiffs must show (1) that they engaged in protected activity, (2) they suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the employment decision. *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 998 (9th Cir. 2017). This claim also appears to be based on Plaintiffs' participation in the Stripper Strike. Compl. ¶ 58. Defendants

are entitled to summary judgment on this claim for the same reasons as for the other retaliation claims. Plaintiffs did not engage in protected activity because they did not report any unlawful practices before their alleged termination, and Plaintiff Doe did not suffer an adverse action. The Court turns to Plaintiffs' motion for summary judgment on Defendant's counterclaims.

## III.    Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaims

Defendant counterclaimed against Plaintiffs for unjust enrichment and intentional interference with economic relations. Answer ¶¶ 82-94. Plaintiffs move for summary judgment on both claims. Pl. Mot. 39-42. The Court concludes that Plaintiffs are entitled to summary judgment on both claims.

### A.    Unjust Enrichment

Defendant filed a counterclaim against Plaintiffs for unjust enrichment, asserting that Plaintiffs benefitted from being treated as independent contractors and seeking restitution in the form of a return of private and semi-private performance fees as well as set offs against any award of wages and benefits. Answer ¶¶ 82-90. Plaintiffs move for summary judgment on this counterclaim, arguing that it is not permitted under the FLSA. Pl. Mot. 39-40. The Court concludes that Defendant's unjust enrichment claim must be dismissed because it seeks to circumvent the requirements of federal and state wage and hour law.

"Unjust enrichment is an equitable doctrine." *Wilson v. Gutierrez*, 261 Or. App. 410, 411, 323 P.3d 974 (2014). "The elements of the quasi-contractual claim of unjust enrichment are (1) a benefit conferred, (2) awareness by the recipient that she has received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it." *Id.* at 414 (internal quotations omitted). The third element is a question of law. *Id.*

Defendant asserts that Plaintiffs "enjoyed the benefits and advantages of providing services as independent contractors including the freedom, flexibility, and tax advantages of such a relationship[.]" Def. Resp. 17. Defendant argues that Plaintiffs' back wages would constitute a windfall because Plaintiffs earned money in the form of tips and private dance fees. *Id.* at 17-18. Plaintiffs counter that the benefits Defendant points to "are not related to the set offs to Plaintiffs' wages that Defendant request[s] as a remedy." Pl. Reply 29. Plaintiffs argue that Defendant makes no attempt to quantify the alleged unjust benefit to Plaintiffs, showing that the real motivation is to share its liability with Plaintiffs. *Id.* Leaving aside the dispute over the degree of freedom and flexibility Plaintiffs in fact enjoyed, Defendant has not attempted to quantify the freedom, flexibility, or tax advantages Plaintiffs may have obtained as a result of being classified as independent contractors. No evidence in the record establishes the value of those alleged benefits. Plaintiffs are also correct that Defendant has failed to show a connection between the benefits alleged and the restitution sought.

The Court next considers Plaintiffs' argument that Defendant in fact seeks indemnity for its FLSA violations and that the claim is therefore against public policy. Plaintiffs point to *Scalia v. Employer Solutions Staffing Grp., LLC*, 951 F.3d 1097, 1105 (9th Cir. 2020), *Lyle v. Food Lion, Inc.*, 954 F.2d 984, 987 (4th Cir. 1992), and *Cordova v. Fedex Ground Package Sys., Inc.*, 104 F. Supp. 3d 1119, 1133-36 (D. Or. 2015). In *Scalia*, the Ninth Circuit held "that the FLSA does not imply a right to contribution or indemnification for liable employers" and declined to make federal common law recognizing such a right. 951 F.3d at 1104-05. The employer had sought contribution or indemnification from other employers. *Id.* at 1101. In *Lyle*, the employee sued the employer for FLSA violations, and the employer filed a third-party complaint against the employee's supervisor for breach of contract and breach of fiduciary duty on the basis that

the supervisor had violated the employer's policy on off-the-clock work. 954 F.2d at 987. The Fourth Circuit concluded that the claims effectively sought indemnification by the supervisor and were thus properly dismissed. Id.

Cordova is closest to the facts here. In Cordova, workers sued FedEx, alleging that they were improperly classified as independent contractors. 104 F. Supp. 3d at 1122. FedEx brought a third-party complaint against the companies it alleged were the true employers of the plaintiffs, including a claim for unjust enrichment. Id. at 1124-25. The benefits the third-party defendants allegedly received were "the right to enter a business relationship with FedEx Ground, the flexibility of independent business ownership, and a contract price negotiated in reliance on the allocation of risk and responsibility set forth in the Operating Agreement," as well as tax benefits. Id. at 1133. This Court concluded that the unjust enrichment claim failed because the relief sought—unlawful deductions and penalties—was not connected to the benefits allegedly conferred. Id. The Court concluded, "the allegations amount to an indemnification claim for the damages Defendant may owe to Plaintiffs." Id.

Here, similarly, Defendant seeks:

[A] return of all private and/or semi-private performance fees, set offs against any award of wages, overtime wages, monetary benefits, or other amounts or damages to which Plaintiffs/Counter-Defendants may be found to be entitled to, and/or any of those fees received by Plaintiffs/Counter-Defendants but not remitted to Defendant/Counterclaimant, in an amount no less than $825,000.

Answer ¶ 90. The amount of $825,000 is the minimum combined amount Defendant alleges Plaintiffs earned in tips and private dance fees while dancing at Club 205. See id. ¶ 89.

Relying on their opposition to Defendant's Motion, Plaintiffs argue that Defendant cannot properly offset wages owed with tips Plaintiffs received. Pl. Reply 26. The FLSA's regulations provide that "[a] tip is a sum presented by a customer as a gift or gratuity in

recognition of some service performed for the customer. It is to be distinguished from payment

of a charge, if any, made for the service. Whether a tip is to be given, and its amount, are matters

determined solely by the customer." 29 C.F.R. § 531.52. Under federal law, an employer may

pay a customarily tipped employee a wage as low as $2.13 per hour and allow tips to make up

the rest of the minimum wage requirement. *Id.* § 531.50(a). The employer must inform the

employee that it is taking advantage of the "tip credit" provision. *Id.* § 531.50(b). Plaintiffs assert

that Defendant never advised them that it was taking a tip credit. Pl. Resp. 25; Doe Decl. ¶ 7,

ECF 37; Hollis Decl. ¶ 5, ECF 38. Defendant provides no evidence that it informed Plaintiffs it

was using the "tip credit" provision of federal law. The record shows that Defendant did not

meet the requirements to take a tip credit under the FLSA. Plaintiffs also correctly point out that

Oregon law does not allow employers to take a tip credit. Pl. Resp. 24 n.3 (citing O.R.S.

653.035(3)). Defendant's argument about tip credits does not even apply to Plaintiffs' Oregon

minimum wage claims.

   Plaintiffs also argue that the private dance fees they charged were tips and not service

charges. Pl. Resp. 26. Private dance fees do not meet the regulatory definition of a tip. Plaintiffs

were required to charge a minimum amount for private dances, so the payment was not

determined solely by the customer as required under the regulations. But it is not clear that the

private dance fees qualify as service charges either. Under the FLSA, a compulsory service

charge "is not a tip and, even if distributed by the employer to its employees, cannot be counted

as a tip received in applying the provisions of sections 3(m)(2)(A) and 3(t)." 29 C.F.R. §

531.55(a). "[S]ervice charges and other similar sums which become part of the employer's gross

receipts are not tips for the purposes of the Act. Where such sums are distributed by the

employer to its employees, however, they may be used in their entirety to satisfy the monetary

requirements of the Act." *Id.* § 531.55(b). Private dance fees do not appear to fit the definition of a service charge because any amount charged above the club's set minimum fee was not compulsory from the perspective of Defendant, the employer under the FLSA.

Even if the private dance fees were service charges, Defendant has not met the requirements to use them to offset its minimum wage obligations. Plaintiffs received payments for private dances directly from customers. Lewis testified that he did not track the amount dancers earned. Spencer-Scheurich Resp. Decl. Ex. 6, Lewis Dep. 93:1-11. He only tracked the number of dances a dancer did and the amount of fees that dancers were paying to the club. *Id.* at 93:15-24. Dancers paid Defendant $5 per song they performed to. *Id.* at 115:12-19. They were required to charge a minimum of $20 for private dances. Fleischmann testified that the club did not keep records of the income it received from a particular dancer. *Id.* Ex. 3, Fleischmann Dep. 54:2-7. Defendant did not keep records of the portion of the private dance fees it received from Plaintiffs, and the amount beyond what Plaintiffs were required to pay Defendant was not reported to Defendant and never passed through Defendant's hands. Thus, the money retained by Plaintiffs was not part of Defendant's gross receipts. The private dance fees retained by Plaintiffs cannot be used to offset Defendant's minimum wage obligations either as tips or as service charges. In short, Defendant seeks restitution of funds to which it is not entitled under either state or federal wage and hour statutes.

Defendant's unjust enrichment claim seeks to circumvent the requirements of the FLSA and Oregon's minimum wage statute and recover funds to which Defendant is not entitled under either statute. Further, the restitution Defendant seeks is not tied to the alleged benefits conferred on Plaintiffs. Defendant submits no evidence of the value of the benefits allegedly conferred, instead seeking to offset the cost of compliance with minimum wage laws with tips and private

dance fees customers gave directly to Plaintiffs. Defendant fails to state a claim for relief.

Alternatively, Defendant fails to provide evidence in support of its claim. Plaintiffs are entitled to

summary judgment on Defendant's unjust enrichment counterclaim.

  B.  Intentional Interference with Economic Relations

  Defendant alleges that Plaintiffs unjustly interfered with Defendant's relationships with

other performers by encouraging them not to fulfill the obligations of their contracts. Answer ¶¶

91-94. The parties agree that the basis of the claim is Plaintiffs' promotion of the Stripper Strike.

Pl. Mot. 41; Def. Resp. 19.

> To state a claim for intentional interference with economic relations, a plaintiff
> must allege each of the following elements: (1) the existence of a professional or
> business relationship (which could include, *e.g.,* a contract or a prospective
> economic advantage), (2) intentional interference with that relationship, (3) by a
> third party, (4) accomplished through improper means or for an improper purpose,
> (5) a causal effect between the interference and damage to the economic
> relationship, and (6) damages.

*McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995).

  Plaintiffs move for summary judgment on this counterclaim for two reasons. First, they

argue that if they were employees, the claim is preempted by the NLRA. Pl. Mot. 41-42. Second,

they argue that Defendant has no evidence of damages. *Id.* at 42. Plaintiffs' counsel states that

despite saying it would do so, Defendant produced no documents in response to Plaintiffs'

discovery request for evidence of damages. Spencer-Scheurich Mot. Decl. ¶¶ 12-13. Plaintiffs

also point to Lewis's testimony that he was not aware of any problems recruiting or scheduling

dancers because of Plaintiffs' actions. *Id.* Ex. 6, Lewis Dep. 222:9-223:4.

  The Court need not address Plaintiffs' preemption argument because Plaintiffs correctly

point out that Defendant has no evidence of damages. Defendant asserts that Plaintiffs admit that

Defendant lost clients and customers because of Plaintiffs' actions. Def. Resp. 20. Defendant

relies on a single piece of evidence: a message from a person who wrote to Plaintiff Doe on

social media, "Ok, i only went to 205 for you, so I will follow you wherever [heart emojis]."

Muñoz Resp. Decl. Ex. D, Doe Dep. Ex. 10. Plaintiffs respond that this evidence is insufficient

because the claim alleges intentional interference with *other* dancers besides Plaintiffs. Pl. Reply

29-30. Plaintiffs are correct. The only evidence of damages Defendant identified in opposition to

Plaintiffs' motion is evidence of damages (loss of a customer) caused by Plaintiff Doe's decision

not to work at Club 205. This cannot serve as evidence of damages for Defendant's claim

because intentional interference with economic relations is based on interference by a third party.

Plaintiff Doe was not a third party to any contract between herself and Defendant. Defendant

provides no evidence of damages flowing from Plaintiffs' alleged interference with Defendant's

business relationships with other dancers at Club 205. Plaintiffs present evidence that there are

no such damages. Plaintiffs are therefore entitled to summary judgment on this claim.

  To summarize, Plaintiffs are entitled to partial summary judgment and Defendant is

entitled to partial summary judgment. Plaintiffs have standing to pursue their FLSA claims and

are employees for their FLSA and Oregon minimum wage claims. Plaintiffs are entitled to

summary judgment on their Oregon minimum wage claims because it is undisputed that

Defendant did not pay Plaintiffs any wages. Plaintiffs are not entitled to summary judgment on

their FLSA claims because there is a genuine dispute over whether Defendant's violation of the

FLSA was willful. Defendant is entitled to summary judgment on Plaintiffs' retaliation claims.

Finally, Plaintiffs are entitled to summary judgment on Defendant's counterclaims.

//

//

//

62 – OPINION & ORDER

## CONCLUSION

Defendant's Motion for Summary Judgment [32] is GRANTED IN PART. Plaintiffs'

Motion for Partial Summary Judgment [34] is GRANTED IN PART.

IT IS SO ORDERED.


DATED: December 26, 2023 .



MARCO A. HERNÁNDEZ
United States District Judge